ELLA MARIE FALLON, complainant-appellant,

*v.*

JOHN J. FALLON, JR., defendant-respondent.

[Submitted May 27th, 1932.   Decided October 17th, 1932.]

On appeal from a decree of the court of chancery advised by Advisory Master Herr, who filed the following opinion:

"This is a suit for separate maintenance brought by the complainant, Ella Marie Fallon, against her husband, John J. Fallon, Jr., under section 26 of the act entitled 'An act providing for divorces and for decrees of nullity of marriage and for alimony and the maintenance of children' (*P. L. 1907 p. 474*), which provides that 'in case a husband, without any justifiable cause, shall abandon his wife or separate himself from her, and refuse or neglect to maintain and provide for her, it shall be lawful for the court of chancery to decree and order such suitable support and maintenance, to be paid and provided by the said husband for the wife and her children, or any of them, by that marriage, or to be made out of his property, and for such time as the nature of the case and circumstances of the parties render suitable and proper in the opinion of the court, and to compel the defendant to give reasonable security for such maintenance and allowance, and from time to time to make such further orders touching the same as shall be just and equitable * * *.'

"The suit is based upon the alleged constructive abandonment of the wife by the husband. They were married on June 10th, 1925. Two children were born to them, who are now in the mother's custody, to wit, Ruth, born March 21st,

1926, and John J. Fallon, 3d, born May 2d, 1927. After their marriage they resided in an apartment at 700 Hudson street, Hoboken, until November 25th, 1928, when the complainant left the home with the children and went to her parents' home in Jersey City, where she has ever since resided separate and apart from the defendant. She asserts that she was compelled to leave her husband's home 'because of his cruel and inhuman treatment,' and insists that she had come to the end of her endurance; that to have remained longer with her husband would have caused the ruin of her life and the lives of the children; that because of his cruel and inhuman treatment she was suffering from a nervous breakdown; in short, that her husband has been guilty of a constructive abandonment of her within the meaning of the statute.

"The defendant, in his answer, denies all charges of cruelty and insists that he is ready, anxious and willing for his wife to return to him; that he has repeatedly told her so and assured her that he will support her and the children to the best of his ability if she will return to him; that she left him without justification and remains away from him without just cause, and that he has made repeated and sincere overtures for her return, without success.

"It is conceded that there has been a refusal by the defendant to maintain and provide for complainant and the children since November 24th, 1928, until this court provided by its order, *pendente lite*, for such maintenance; the defendant from the day of the separation insisting that for him to voluntarily provide for her support elsewhere than with him would tend to encourage her in continuing the separation and would amount to an admission that she was justified in leaving and remaining away from him.

"For a wife to prevail in a suit of this nature it is necessary for her to show, first, that her husband has abandoned her or separated himeslf from her without justification, and second, that he has refused or neglected to maintain and provide for her. *Anshutz* v. *Anshutz, 16 N. J. Eq. 162; Weigand* v. *Weigand, 41 N. J. Eq. 202; Taylor* v. *Taylor, 73 N. J. Eq. 745; Pinkinson* v. *Pinkinson, 92 N. J. Eq. 669.*

"And when the husband so deals with his wife that she is compelled to leave him because of his cruel treatment, their separation will be deemed, in view of this court, an abandonment by him. *Maas* v. *Maas, 34 N. J. Eq. 113.*

"It is the duty of the wife to live with her husband at his home and to give him her services and society. From these obligations she is only relieved if she can show that the conduct of her husband has been such as will reasonably convince the court that her life or health are in danger or her life rendered one of such extreme discomfort and wretchedness as to incapacitate her to discharge the duties of a wife, or that the conduct of the husband, if continued, would have brought about these conditions. *Taylor* v. *Taylor, supra; Pinkinson* v. *Pinkinson, supra.*

"Extreme cruelty which will justify the separation of one spouse from the other is that degree of cruelty, either actually inflicted or reasonably feared, which endangers the life or health of the aggrieved party, or renders his or her life one of such extreme, discomfort and wretchedness as to incapacitate him or her, physically or mentally, to discharge the marital duties. *Smith* v. *Smith, 40 N. J. Eq. 566; Taylor* v. *Taylor, supra; Pfender* v. *Pfender, 106 N. J. Eq. 373.*

"The misconduct relied on to justify the wife in leaving her husband must amount to a ground of divorce *a mensa* or *a vinculo,* and it is not a necessary ingredient in constructive desertion that the husband shall entertain, in connection with his acts of cruelty, any settled purpose to drive his wife from him; it is enough if such is the natural consequence of his acts. *Rogers* v. *Rogers, 81 N. J. Eq. 479; Danielly* v. *Danielly, 93 N. J. Eq. 556; Csanyi* v. *Csanyi, 93 N. J. Eq. 11; McVickar* v. *McVickar, 46 N. J. Eq. 490; Skean* v. *Skean, 33 N. J. Eq. 148; Starkey* v. *Starkey, 21 N. J. Eq. 135; Suydam* v. *Suydam, 79 N. J. Eq. 144.*

"In *Sachs* v. *Sachs, 107 N. J. Eq. 41, 47,* the court of errors and appeals said:

" 'It is impossible to define, with accuracy, the exact meaning of the term "extreme cruelty," as used in the statute, which provides for an absolute divorce on that ground, but

this court, in *Doty* v. *Doty, 92 N. J. Eq. 660,* has approved of the rule as stated by Vice-Chancellor Van Fleet, in *Black* v. *Black, 30 N. J. Eq. 215* (at *p. 221*), wherein he said: "To justify a divorce *a mensa et thoro,* actual physical violence need not be proved, but such conduct, by the husband, must be shown as will justify the court in believing that, if he is allowed to retain his power over his wife, and she is compelled to remain subject to him, her life or her health will be endangered, or that he will render her life one of such extreme discomfort and wretchedness as to incapacitate her to discharge the duties of a wife." *Close* v. *Close, 10 C. E. Gr. 529; English* v. *English, 12 C. E. Gr. 585.'*

"And in *Cavileer* v. *Cavileer, 94 N. J. Eq. 160, 163,* the court of errors and appeals said:

" ' "Extreme cruelty," as used in our divorce act, is such cruel conduct as endangers the safety of the person or the health of the aggrieved party, either actually inflicted or reasonably apprehended. *Smith* v. *Smith, 40 N. J. Eq. 566; Taylor* v. *Taylor, 73 N. J. Eq. 745.'*

"See, also, *Margarum* v. *Margarum, 57 N. J. Eq. 249; Arnaboldi* v. *Arnaboldi, 101 N. J. Eq. 126; Dummer* v. *Dummer, 41 Atl. Rep. 149; Cavileer* v. *Cavileer, supra; Doty* v. *Doty, supra; Regan* v. *Regan, 100 N. J. Eq. 158.*

"Under these definitions, drunkenness and vile language, without more, do not constitute extreme cruelty. *Bridge* v. *Bridge, 93 Atl. Rep. 690.*

"Nor is a false charge of adultery extreme cruelty *per se.* To constitute extreme cruelty such a false charge must be maliciously or wantonly made, and must be made under circumstances which in fact cause anguish and pain of the extreme nature contemplated by the definitions. Even then, if the accusation be made under stress of reasonable suspicion caused by the wife's conduct, it does not amount to extreme cruelty. *Barton* v. *Barton, 97 N. J. Eq. 404; Hill* v. *Hill, 97 N. J. Eq. 237.*

"Constant quarrelling does not in itself constitute extreme cruelty. *Brinkerhoff* v. *Brinkerhoff, 106 N. J. Eq. 331.*

"The court must in each case look to the effect of the con-

duct complained of upon the health, mental and physical, of the wife, for it is an essential element of extreme cruelty that its effect upon the mind or body of the aggrieved spouse shall have been substantially deleterious, or that if allowed to continue, it reasonably would have become so. Conduct which would imperil the health of a refined and delicate wife might be endured with comparative unconcern by one of a less sensitive nature. *Close* v. *Close, 25 N. J. Eq. 526; Thomas* v. *Thomas, 87 N. J. Eq. 668; Casey* v. *Casey, 83 N. J. Eq. 603.*

"And it may well be remarked at this point that if a wife, knowing the disposition of her husband, willfully persists in a course of conduct that aggravates or intensifies the situation of which she complains she is not entitled to relief. *Duvale* v. *Duvale, 34 Atl. Rep. 888; affirmed, 65 N. J. Eq. 771; Casey* v. *Casey, supra.*

"Conduct by a husband toward his wife may be said to amount to extreme cruelty *per se,* because the law will presume from the nature of such conduct that it is malicious and intended to force a separation, and that its effect upon the wife is such as to imperil her life or health, or render her life one of such extreme discomfort and wretchedness as to incapacitate her to discharge the duties of a wife. An example of such extreme cruelty *per se* would be the keeping of a paramour by the husband in the matrimonial home. If such a fact were proved, evidence of the husband's intent and of the effect of his act upon the health of his wife would be quite immaterial.

"On the other hand, certain sorts of conduct on the husband's part which might be bitterly resented by the wife, and which might even render her life one of extreme discomfort and wretchedness, can safely be said not to amount to extreme cruelty under any circumstances. For example, take some of the complaints made in this case, such as the husband's 'interference' with the wife's management of the home and care of the children. Such conduct does not in law amount to 'interference.' The husband is entirely within his rights, regardless of his motives in exercising them and regardless of the effect of such conduct upon his wife's health and happiness.

"But there is a large middle ground which includes cases where the husband's conduct may or may not amount to extreme cruelty, depending upon the motives and the degree of provocation and persistence of the husband, the state of health, refinement and delicacy of the wife, the station in life, background, education and surroundings of the parties, and upon all of the facts and circumstances of the case.

"The case *sub judice* lies within this middle ground, so far as the graver charges made by complainant are concerned. The greater number of her charges against her husband do not, either separately or collectively, or in conjunction with the graver charges, amount to extreme cruelty. At most they are instances of such infirmities and defects as in contemplation of law a wife undertakes to put up with when she takes her husband for better or worse. She would not have thought of them as amounting to cruelty, in themselves, and would not have made serious complaint of them if there had been no other causes for complaint.

"Such charges include her complaint that her husband was strict in money matters and insisted upon her keeping accurate accounts; that she was compelled to do her own housework following the birth of Ruth, and that he quarreled with the trained nurse and complained of the negligence of a maid.

"The first serious causes of complaint made by the complainant against her husband are the so-called 'Spano incident' of the summer of 1911, the Ross-Fenton Farm episode and the incident of the mortgage.

"These difficulties arose from the husband's objection to his own wife's having anything to do with Dr. Spano, from his belief that his wife's father was withholding a $5,000 mortgage which had been her wedding gift from her parents and from his insistence that his wife's mother should not influence his wife in the rearing of his children or the management of his home.

"With regard to the Spano incident, it is very apparent that the defendant was unreasonably and violently jealous of Spano. He resented the fact that his wife addressed Spano

by his first name. When he became intoxicated, as he sometimes did, he used forceful language to express his feelings regarding Spano. But he did not accuse complainant of adultery. If, as she complains, he told her that Spano would get the best of her and she would like it, it seems to me that while his language was vulgar and heated by jealousy, his motive was to protect her and his home by keeping Spano away, rather than to gratuitously insult his wife. Unreasonable and causelessly jealous he may have been, but his conduct in this matter did not amount to extreme cruelty.

"As to the mortgage incident, the evidence demonstrates that Fallon had good reasons to suspect that no mortgage had in fact been assigned to his wife. His insistence that she secure from her father either the mortgage itself or $5,000 in money in lieu thereof, caused resentment, but it appears that he did it for the sake of his wife and children rather than for himself, and I think she has no just cause to complain. Had he not by his insistence caused her to ask her father for the money, it seems to me that she might never have received it. However that may be, the defendant's insistence was certainly not an act of cruelty.

"Now, was there anything really serious in the Ross-Fenton Farm episode? The defendant got drunk and acted in a boisterous and objectionable manner. He and complainant were with his sister and brother-in-law. There was no occasion for the complainant to be 'mortally ashamed' or in any fear of her husband.

"She complains of three of four occasions following the Ross-Fenton incident, between September, 1927, and the Christmas holidays of that year, on which occasions he called her approbrious epithets because she had complained to his parents about his conduct, called her mother and brothers insulting names, and according to her charges made himself extremely obnoxious and disagreeable. But with the payment to the complainant of the $5,000 by her father the chief cause of trouble was apparently removed, for she says that for a number of months thereafter there were no scenes. Her only complaint is that during this period he objected to her

mother's visiting his home and was critical of complainant's management of the home and care of the children.

"This brings us to what I regard as the first important event in the history of the difficulties between the parties, the scene at Avon on July 22d, 1928. The defendant was drunk, and continued for several hours through the night to browbeat complainant, who although exhausted, cold and nervously upset, was forced to listen to his vulgar and offensive characterizations of her family, and his criticism of her management of the home and children, intimidated and terrified under threats of physical violence. I am paraphrasing the language of her charge as set forth in the bill, and assuming the exact truth of this charge, as explained and amplified by her testimony. The gist of her complaint is that when her husband became drunk his conduct and language were brutal and unbearable.

"On the following morning, when he was sober again, there was no resumption of the quarrel. She drove him to the station as usual and kissed him good-bye. She had already determined to leave him but did not tell him so. Apparently this was the first occasion on which he had been drunk for a period of several months.

"When Mrs. Fallon returned from the station she packed some bags and took the train for Jersey City, with the children and maid, going to her parents' home and remaining several days. The defendant, by telephone, repeatedly urged her to return and she finally consented on certain conditions which she reduced to writing and insisted that he sign. These were (1) that there would be no future occurrence of the previous Sunday night's disturbance; (2) that there would be no interference by him with her 'management of my house and care of my children;' and (3) that he would try to cultivate a more respectful attitude toward her and her kin, 'that is, not compare respectable women with those who are otherwise.'

"It is significant that she did not require him to promise not to drink. The evidence shows that on a number of occasions, in the company of friends, the complainant and de-

fendant went to parties and restaurants where they all consumed liquor. In this respect they appear to have acted normally, considering their station in life. The complainant has no reasonable complaint to make of her husband's treatment of her except on the infrequent occasions when he drank too much. She did not want him to stop drinking entirely, but only to stop getting drunk.

"The second condition is significant also as showing her attitude toward home and children. She considered them more hers than his, in the sense that she was the head, not he. She resented what she regarded as his interference. Of course, she had no legal justification for such an attitude, and his conduct and criticisms in this respect were justified in law, if not in fact. Assuming that his criticisms were entirely unjust he still had an unquestioned legal right to make them; in law he was the head of the household, supplied the means of maintaining it, and was entitled to exercise a large measure of control over it. *Pattberg* v. *Pattberg, 94 N. J. Eq. 715.*

"The third condition was that he would endeavor to cultivate a more respectful attitude toward her and her family, 'that is, not compare respectable women with those who are otherwise.' In her testimony Mrs. Fallon says that her husband was friendly in his manner toward her parents when in their presence, but complained to her about them at other times (page 112), that only on one occasion did he show an unfriendly manner toward her mother and that was when he objected to her mother's picking up the child Ruth (page 113), that whenever he was under the influence of liquor he brought up to her his grievance against her family (page 131). She knew of his antipathy toward her family and his objection to having her mother visit in his home, but she persisted in seeing her mother frequently, meeting her with the children in the park near her home. She testified further (page 415) that his attitude toward her parents made no difference to her, but that she considered that his persistent scolding about them to her, and calling them and her brothers names, was cruel and brutal.

"The defendant was reluctant to sign the conditions but finally did so in order to secure his wife's return.

"I cannot agree with the complainant that she was justified in separating herself from her husband at this time. However brutal his conduct on the Sunday evening, July 18th, 1928, may have been, it was caused by his drunkenness on that occasions, the first in many months. On the following morning he was not objectionable. The complainant was in no physical fear of him then. I cannot think that his conduct when he was drunk on this occasion was so terrifying to the complainant as it was nervously exhausting. It amounted to persistent nagging which wore down her nervous resistance until she became, temporarily, extremely miserable. The next morning she was not too exhausted to drive her husband to the station and to pack and move the maid and children back to the city: the effect of his conduct, in other words, was not to incapacitate her in any way. In her written conditions she does not seem to rank the occurrences of that night as of greater importance then his interference with her management of home and children and his characterizations of her parents.

"And if Mrs. Fallon was unjustified in leaving her husband on this occasion it follows that she was unjustified in exacting any written promises from him as the condition of her return, so that these written promises in my judgment are of value only in showing what the complainant's state of mind was at the time she wrote them.

"Again, the following month, the defendant became intoxicated. According to complainant's testimony, the parties, in company of the defendant's sister and brother-in-law, went together in the evening to Eggerman's roadhouse in Spring Lake for something to eat and drink, and the defendant drank too much. When they got home the defendant went to the kitchen with his brother-in-law, Mr. Russ, while the complainant and Mrs. Russ remained in the living room. Defendant and Mr. Russ drank more liquor in the kitchen, and defendant complained to Mr. Russ of his wife being lazy, and not caring for the children, voiced his objection to his house being run in the manner that complainant's mother ran her house, and slandered her mother and father. He

spoke of the mortgage and the Spano incident, referred to Spano as a dirty wop and said that the complainant would be glad to have Spano get the best of her and that he was going to make a will so that Spano could never get any of his money.

"The complainant says that she overheard this talk and sought to quiet the defendant, but he continued his tirade even after Mr. and Mrs. Russ had left, until complainant's nervous reaction alarmed him and he called the maid to look out for her.

"No reference was made by either party to this episode in the weeks that followed, and there was no repetition of it until the November quarrel which preceded the wife's final separation. Apparently the defendant was kind to his wife during this period and she had little to complain of. The trouble was again due to defendant's over-indulgence in liquor. Knowing his weakness in this respect it is surprising that complainant did not strive in any way to prevent his excess drinking. She was one of the party and went to the roadhouse for the purpose of getting drink as well as food. Apparently she drank with the rest. She did not protest against defendant's drinking, either at the roadhouse or afterwards at their home. She did not ask his sister or his sister's husband to help her by using their influence and example.

"During the trial the complainant testified that her husband made several attempts to secure unnatural sexual intercourse with her; that he did not succeed; that he was drunk when he made the attempts and afterwards denied having made them. In cross-examination she gave this as a reason for asking a separate bed in the fall of 1928, but in her direct testimony she said the only reason she had for this request was that the apartment was crowded. Page 86. She does not plead the alleged attempts as one of the grounds justifying her separation, and does not mention them in her subsequent letters as a cause of complaint. I have therefore ignored this charge.

"Things went smoothly then, from August until November of 1928. On November 24th they had dinner together and

were entirely friendly. His car was outside. One, Watts, called defendant up from the Elks club, drunk. This man, who was a brother of one of complainant's school friends, had previously come to Hoboken, in a drunken condition, and had acted in such a manner as to cause the Fallons to feel disgraced. Complainant drove her husband to the Elks club, so that he might get Watts away before he should disgrace them again, and having dropped her husband at the club, proceeded to drive to her mother's. She returned about nine-thirty P. M. to find Watts and her husband at the home, engaged in drinking. Watts looked drunk, but not her husband. She did not object to their drinking. Page 156. She then went with them both to Braunstein's restaurant in a taxi, where all of them, including complainant, had liquor. Then they all went to the Hermitage, another restaurant of the same sort. She says that the defendant's manner and conduct toward her were not objectionable, although he was gradually becoming drunk. Watts became very drunk at the Hermitage.

"Complainant says that while she did not approve of taking Watts out to two restaurants in his drunken condition she did not protest, because she knew it would do no good to protest, that by the time they left Braunstein's the defendant had had so much liquor that she knew that nothing she could says or do would influence him. Page 170.

"It may be well here to analyze the complainant's attitude in regard to her husband's use of liquor. She had learned by experience that once the defendant had had a few drinks he was apt to continue until he had had too many, and that the scenes of which she so bitterly complains occurred when he had had too many drinks. Yet she says she never objects to the defendant's drinking within moderate bounds. Page 157. And on the occasion in question, knowing that Watts was drunk when she first saw him, knowing her husband had been drinking with Watts, and knowing that her husband took with him a pint of whiskey, she not only did not object to their going to Braunstein's, but went with them and joined in the drinking. This she did although she well knew that her husband might drink too much, and might then, as he

had repeatedly done in the past, nag her about her family, about Spano, about the management of the home and her care of the children. By repeated experience she had reasonable cause to apprehend a repetition of such a scene that night, before they left for Braunstein's. Why then should she have deliberately encouraged her husband's drinking on this occasion? Had she protested against going to Braunstein's, had she refused to go herself, the scene which followed might well have been avoided. She says that she did try to persuade defendant not to go, and says that she went along because she thought she might prevail upon him to return early. But is this explanation consistent with her joining them in drinking at Braunstein's, and her failure at any time to try to get her husband home? In my judgment her experience of her husband's character and disposition should have kept her at all hazards from going with him and Watts on this expedition. She could not have failed to foresee how it would end. If she found herself unable to persuade her husband to stay home and send Watts away, she should have taken measures to prevent the subsequent scene by going to her mother's with the children for the night, or by seeking the protection of the defendant's parents who occupied the apartment above them.

"They all returned home in a taxi about four A. M. The defendant wanted to give Watts a final drink. Complainant then said, 'let Jimmy [Watts] go, he had his nightcap.' Defendant replied, 'he is here now and he is going to stay, we won't let him go.' Watts remained, and he and defendant continued to drink. Complainant proceeded to clear up the empty bottles and empty the ash trays from the dining room table. Defendant by then had become very drunk. He voiced his objection to the condition of the apartment, blaming his wife for it, and in effect ordered her to go to bed. Complainant says she was afraid to go to bed, because she thought defendant would come in later and rout her out. She went to the living room and lay down on the couch. She heard her husband relate the Spano incident to Watts, and tell him that the complainant was faithful to him only because he

gave her no chance to be otherwise. She heard him discuss her parents with Watts, characterizing them by the same objectionable epithets as he had previously employed on similar occasions.

"The maid arose about five A. M., prepared breakfast for herself and then went out to early mass. Fallon came into the kitchen with his wife, and [she says] acted in an extremely aggressive and ugly manner, intimidating and browbeating her. She ran to the bathroom and bolted herself in. He followed and broke open the door. She screamed and ran through the hall to the living room. At this point the defendant's mother came down from her apartment upstairs and said that if the noise did not stop she would arouse defendant's father.

"Complainant says she was in great fear of her husband's violence on this occasion, yet she did not ask Mrs. Fallon, Sr., to stay with her or to furnish any protection.

"After the defendant's mother had left, complainant dressed the children, and as soon as she could get away, left the house with the children and the maid, who had returned from church, leaving Watts and Fallon still drinking in the living room.

"She has no definite intent to permanently leave her husband at this time, but only an instinctive urge to get out of the house. She walked the several blocks to the garage, got her husband's car, and drove to her parents' home.

"She says she was very nervous and hysterical, actually collapsing when she arrived, but she did not go to a doctor for several days.

"She says that she never had definitely made up her mind to permanently separate from her husband. Certainly she had no such intent on November 25th, 1928. But she has never returned. Her state of mind is clearly shown by her letters to her husband following the separation, if read in conjunction with her husband's letter to her. She did not tell her husband where she was and she did not reply to his first letters urging her return and apologizing for his conduct of November 24th.

"The defendant's letters show from the first a sincere desire on his part that his wife and children return to him. It is impossible to read them without coming to the conclusion that he truly loved his wife and children.

"The complainant wrote her husband on December 4th, 1928, refusing to return 'to the man who repeatedly debases my character and goodness and the character and goodness of my kin; who slanders me and my kin; who, when he chooses to be drunk, uses profane and vile language; whose disorderly conduct arouses the house, and who, with desperate threats at my life, manhandles me and broke open the bathroom door whence I sought refuge,' and referring to the Avon episode of July 23d and the final scene on November 25th.

"Since the separation, the defendant has repeatedly endeavored to effect a reconciliation, and it seems to me that in the correspondence and conferences which ensued the defendant did everything he properly could do to bring about a reconciliation. Complainant seems to have been influenced by her family, especially by her mother, in refusing all overtures, although apparently she desired to return to her husband and would have done so if left alone.

"She refused to return unless her husband reformed, but declined to return on the faith of his promises. Yet there was no way for her to tell whether he had reformed unless she did return.

"The thing she really wanted was vindication for her parents. In this I think her mother's influence is apparent. Fallon's vilification of them when he was drunk did not assume such serious proportions in her mind until she came to be constantly under her mother's influence.

"So far as her health was concerned, she seems to be of a nervously sensitive temperament. She is affected by thunderstorms. Contact with her mother was nervously disquieting to her, in view of the antipathy existing between her mother and her husband.

"It is impossible to escape the conviction that the influence of the complainant's mother has been throughout the married

life of these parties a disturbing influence, and since their separation has tended to prevent a reconciliation. I do not mean that such influence has been intentionally used at any time to these ends. But it is apparent that complainant was and is much attached to her mother, that her mother's influence over her is strong, and that she never was willing to exclude her mother's influence from her own home, although she knew that her husband resented it.

"In this respect and in connection with his drinking, I think complainant can fairly be said to have contributed by her own acts and conduct to the deplorable scenes of which she complains. And in my judgment the evidence does not warrant the conclusion that her life or health was endangered, or her life made one of such extreme discomfort and wretchedness as to incapacitate her, physically or mentally, to discharge her marital duties, because of her husband's conduct, or to justify the court in believing that, if he is allowed to retain his power over her and she is compelled to remain subject to him, her life or health will be endangered, or her life rendered one of such extreme discomfort and wretchedness as to incapacitate her to discharge the duties of a wife.

"While the defendant's conduct toward his wife has been shown to have been at times overbearing and coarse, while he is shown to have occasionally indulged heavily in drink, and when drunk to have been unspeakably vulgar and inconsiderate in his language and manner, still it cannot be said that he sought to drive his wife from him or that the effect of his conduct upon her health was to incapacitate her within the legal definition of extreme cruelty.

"He should realize, as I believe he does now realize, that even though his conduct has not amounted legally to a matrimonial offense, no happiness could ever have been achieved without a more considerate and sympathetic attitude on his part.

"That the mistakes and misunderstandings of this husband and wife should have been aired in open court is deplorable. But it is clear that in spite of everything which has occurred they still have a very deep love and affection for each other,

and for the children. The complainant should now, without delay, arrange to return with her children to such suitable home as the defendant may provide, and profiting by the experiences of the past, I can see no reason why, with reasonable forbearance, the marriage should not be successful.

"I will advise a decree dismissing the bill of complaint."

*Messrs. Ziegener & Brenner,* for the appellant.

*Messrs. Carey & Lane,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons expressed in the opinion filed by Advisory Master Herr.

*For affirmance*—THE CHANCELLOR, TRENCHARD, PARKER, LLOYD, CASE, BODINE, DONGES, BROGAN, VAN BUSKIRK, KAYS, DEAR, WELLS KERNEY, JJ. 13.

*For reversal*—None.