7 N.J. Super. 232 (1950)
72 A.2d 895
GLADYS NAOMI LEHMANN, PLAINTIFF-RESPONDENT,
v.
EDWARD LEHMANN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Divison.
Argued April 10, 1950.
Decided April 27, 1950.
*234 Before Judges McGEEHAN, COLIE and EASTWOOD.
Mr. Sam Weiss argued the cause for the plaintiff-respondent (Mr. Lewis S. Jacobson, attorney).
Mr. Martin B. O'Connor argued the cause for the defendant-appellant (Messrs. O'Connor, Morss & Mancini, attorneys; Mr. Richard R. O'Connor, of counsel).
The opinion of the court was delivered by EASTWOOD, J.A.D.
Plaintiff, Gladys Naomi Lehmann, instituted an action for separate maintenance in the former Court of Chancery against the defendant, filing her bill of complaint on August 6, 1948, wherein she alleged that defendant's acts of cruelty constituted a constructive abandonment of plaintiff. Defendant, in his answer, denied plaintiff's allegations and in a counterclaim prayed for a divorce upon the grounds of extreme cruelty. Plaintiff's answer and amended answer to defendant's counterclaim denied his allegations and set up a defense that the alleged conduct of which defendant complained, was the result of "an anxiety psychoneurosis."
At the conclusion of the hearings, the Chancery Division decided that plaintiff had sustained her asserted grounds for separate maintenance and thereupon directed that judgment be entered for plaintiff; the judgment reciting that it appearing that the dwelling house owned by the parties as tenants by the entirety "will continue to be occupied by the plaintiff and her daughter," defendant shall make the following payments: monthly alimony of $350 for Mrs. Lehmann and *235 daughter, a sum equal to the monthly payment of principal and interest on two mortgages encumbering their dwelling house and $2,500 for counsel fees and costs. The defendant's counterclaim was dismissed. Defendant appeals from the judgment entered against him.
Plaintiff argues that the trial court, having seen and observed the witnesses and having found as a fact that the testimony of Mrs. Lehmann was credible, the judgment against the husband should not be disturbed. In the case of Cartan v. Phelps, 91 N.J. Eq. 312 (E. & A. 1920), the decree of the Court of Chancery was reversed by the Court of Errors and Appeals, holding that "* * * the rule giving great weight in the appellate court to the Vice-Chancellor's finding on a question of fact imposes no restraint on the power of the former to ascertain, by full investigation and analysis of the evidence, what the facts are, and whether the general finding is consistent therewith. * * *" On a review under Rule 1:2-20 and 4:2-6, of any cause involving issues of fact not determined by the verdict of a jury, new or amended findings of fact may be made, but due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. In the instant case, we have concluded that it is essential that we review the evidence and reach our independent findings.
To accomplish a satisfactory review and analysis of the record, it necessitates a somewhat detailed discussion of the evidence.
The parties were married on November 14, 1933. Charlotte Naomi, the only child born of their marriage, is now approximately eleven years of age and is in the custody of the mother.
Plaintiff relies on four alleged acts of physical cruelty committed by defendant upon her, which occurred in January, 1938; October, 1946; July, 1947; and Labor Day week-end, 1947. The mental cruelty of which plaintiff complains consists of defendant's alleged excessive use of alcohol; the manifestation of symptoms of delirium tremens, causing her great *236 pain, concern and fright; attempting to make her believe she was going insane and the so-called practice of voodooism.
The alleged acts of physical violence testified to by plaintiff, and denied by defendant, were isolated incidents occurring over a period of fourteen years. The first act allegedly occurred in January, 1938, at which time she stated that she was pregnant; that when she remonstrated with him about his drinking, he became angry and knocked her to the floor against the couch. The second act did not occur until eight years later, in October, 1946, when he came home late in a drunken condition, sleeping until late the next day; when he arose she argued with him, stating "there were a lot of words," he called her a maniac and then hit her in the face with his open hand. The third incident occurred in July, 1947, when she states that he came home late and she again remonstrated with him about his drinking; she removed a knife from a kitchen drawer, threatening to kill herself, whereupon he took the knife, struck her in the face and she fell to the floor. Defendant testified that he did not strike her, but grabbed her arms for the purpose of taking the knife away from her: that on several occasions she had taken the kitchen knife from the drawer and threatened to kill both herself and him, and on these occasions he was forced to take the knife away from her. The fourth incident occurred shortly before Labor Day, 1947, when Mrs. Lehmann states that her husband had been drinking; that when she saw him sitting at the kitchen table with a glass of beer, she remonstrated with him again about his drinking, creating quite an argument, as she stated "there were a lot of words that night. All of them I don't remember but I became more and more upset;" finally, she picked up the glass of beer and spilled it over his head and it ran down over his clothes; he then went upstairs and lay in the middle of her bed; when she went up, she got into bed beside him; presently he began to make funny noises which made her mad; she jumped out of bed, grabbed one blanket and took it out in the hall, then went into the bedroom and pulled her "little pillow" she slept on from under his head, *237 went back into the room again and attempted to push him out of the bed; he got up and called her an opprobrious name; she stated his conduct did not scare her and becoming angered, "I ran my finger nails down both cheeks;" he then grabbed her and started choking her. In connection with this incident, it is significant that the defendant called the local Chief of Police, who later arrived at the scene, and who testified as a witness for defendant, that he smelled the beer on defendant's clothing, but he saw no signs that defendant was intoxicated. The Police Chief also testified that he observed the marks made by plaintiff's finger nails on defendant's cheeks.
The plaintiff testified to two other specific incidents, one occurring on January 1, 1947, concerning an argument as to whether the plaintiff or defendant would drive her sister-in-law and children home, after defendant, at plaintiff's request, had previously driven to the sister-in-law's home and brought them over to their house to play with their daughter. Mrs. Lehmann insisted that her husband had been drinking and she would not permit him to drive them home. An argument ensued and Mr. Lehmann stated "you insist on taking them home, don't come back, keep going." Mrs. Lehmann did not return for eleven weeks, stating she was afraid to come back. The other incident was the one which occurred on the night of September 23, 1947, when Mrs. Lehmann finally parted from her husband. She testified that her husband and a friend came home that night about 10:30 or 11:00 o'clock, and while she did not see them at first, "I could tell they were drunk;" that after his friend had left the house, she returned to the kitchen and started to clean up all the empty beer cans, etc., and an argument ensued about who should clean up the kitchen. She told him "you are drunk and I am cleaning up," whereupon Mr. Lehmann ran to the front door and called to his friend, Bill Sparks, to return. She asked him not to bring him back because she was only dressed in her nightgown. On Sparks' return, she asked him to leave because she was not dressed, but he refused to do so. She kept insisting upon his leaving. Instead, Sparks followed her up to her bedroom, *238 sat on the bed with her, telling her that she should not treat her husband the way she was treating him; Mr. Sparks "continued to act as though he had to reason with me that I should not treat Mr. Lehmann in this manner." Sparks left only after she had called his wife and asked her to get him to come home. When her mother, whom she had called, came over with her brother, Leo, she left, taking her daughter with her, since which time she has never returned. The defendant testified he made efforts to secure the return of his wife on the occasions she left. For several months after the final separation, he made repeated, but unsuccessful, efforts to ascertain the whereabouts of his wife and daughter. Plaintiff testified that she purposely concealed the daughter from her father during that period of time.
Our courts have established that isolated acts of cruelty are not sufficient to support such an action as instituted by the plaintiff. To justify relief to the plaintiff, it was her duty to establish by the competent evidence a continued course of conduct sufficient to reasonably prove that her life or health was in danger. Close v. Close, 25 N.J. Eq. 434 (Ch. 1874); English v. English, 27 N.J. Eq. 579 (E. & A. 1876); Black v. Black, 30 N.J. Eq. 215 (Ch. 1878); Csanyi v. Csanyi, 93 N.J. Eq. 11 (Ch. 1921).
Other acts of mental cruelty allegedly practiced by defendant upon plaintiff and which she asserts caused her to fear him and injuriously affected her health, are: excessive use of alcohol, manifestation of symptoms of delirium tremens, attempting to make her believe she was insane and the practice of voodooism. We do not consider that the proofs in support thereof or the acts complained of are sufficient to support a decree of separate maintenance, even if we assume the credibility of her testimony. Plaintiff testified that defendant was excessively drunk on many occasions during the period they lived together and that his excessive drinking caused her to fear him when he was in that condition. It is significant that while she insists that she repeatedly remonstrated with him about his drunkenness, she never demanded that he give up *239 drinking altogether, but that he merely imbibe moderately. It appears from the record that she indulged in intoxicating liquors herself, both prior and subsequent to her marriage. We find no support in the record that the incidents of drunkenness to which she testified were such that the plaintiff should have been unduly alarmed, or subjected to any fear of the defendant. The conduct of the plaintiff clearly indicates that actually she had no fear of him. She also complained that when he was drunk, he called her vile names. Neither drunkenness and vile language nor constant quarrelling, without more, constitute extreme cruelty. Bridge v. Bridge, 93 A. 690 (Ch. 1915); Brinkerhoff v. Brinkerhoff, 106 N.J. Eq. 331 (Ch. 1930).
We find no support in the plaintiff's testimony of her charge that her husband inflicted mental cruelty upon her by his attempts to convince her that she was becoming mentally unbalanced. Her testimony in attempting to establish this charge was that he tried to convince her that she had previously made certain statements which she had not made and that he insisted that she had forgotten to do certain things that he had told her to do, which, in fact, he never had told her.
With respect to the alleged acts of voodooism, it consisted of one instance, with respect to a doll that was hung in the kitchen, into which plaintiff testified defendant was constantly sticking pins; that her husband told her every time he thought anything bad about her he would stick a pin in it, and he continually passed by her in the kitchen and would stick pins into the doll, and telling her there was a strange influence over him and that he had no control over his thoughts. Defendant testified that the doll was one of many dolls owned by their daughter; that following a reconciliation, they had made an agreement that when they felt like flying off the handle, instead they would stick a pin in the doll, and that "is why the pins were stuck in the doll." As was stated in Brinkerhoff v. Brinkerhoff, supra, cited with approval in Fallon v. Fallon, 111 N.J. Eq. 512, at pp. 516, 517 (E. & A. 1932):
*240 "The court must in each case look to the effect of the conduct complained of upon the health, mental and physical, of the wife, for it is an essential element of extreme cruelty that its effect upon the mind or body of the aggrieved spouse shall have been substantially deleterious, or that if allowed to continue, it reasonably would have become so. * * *"
We have the conviction from our review of the record, that many of the acts relied upon by plaintiff as alleged cruelty, were occasioned by the course of conduct of the plaintiff that aggravated or intensified the situation and, under such circumstances, "knowing the disposition of her husband * * * she is not entitled to relief." Duvale v. Duvale, 34 A. 888 (Ch. 1896); affirmed, 65 N.J. Eq. 771 (E. & A. 1903).
Plaintiff's contention that her husband's conduct caused her to fear him is not supported by her own testimony. This is evident from the incident resulting in her gouging her husband's face, that happened a few days before she finally left the defendant in September, 1947.
The plaintiff insists that the husband's cruel and abusive treatment towards her has seriously affected her health and that to remain subject to him, her health would be endangered and he would render her life one of such extreme discomfort and wretchedness as to incapacitate her to discharge the duties of a wife. Dr. Gorten, plaintiff's expert medical witness, as the result of one examination he had made of her on the morning of the hearing, for the purpose of testifying, testified, in his opinion, that she was suffering from a medium state of neurosis and was emotionally depressed; that he could not determine whether she was suffering from a psychosis. Dr. Gorten, on cross-examination, testified that Mrs. Lehmann would be nervous merely from the fact that she was confronted that day with her trial and that the "signs" indicating her condition "by themselves alone each one would be caused by the tension with respect to coming to court, but we have to look at the whole picture and that is different, but I agree with you that we have to consider that." This is the only occasion that Dr. Gorten ever examined Mrs. Lehmann. Dr. Robert Doran, Jr., a cousin of Mrs. Lehmann, although he *241 had never treated or examined her from a medical standpoint, testified to her extremely nervous condition as far back as 1939, when he was present at an examination given her by his father, at which time Mrs. Lehmann was accompanied by her husband. Dr. Doran stated at that time, she was quite apprehensive, in quite an excitable state and she had been smoking a good deal. Dr. Doran testified that Mr. Lehmann was always a solicitous person.
With respect to the charges of excessive drinking, it seems difficult to reconcile the plaintiff's testimony in this respect, with the undisputed facts that during the period in question, defendant was promoted from time to time by his employer, the Esso Standard Oil Company, from an original job as an ordinary workman to that of general foreman, a rather responsible position still held by him. In addition, during the same period of time, he taught four or five nights a week over a period of three or four years at the Thomas A. Edison Vocational School, in Elizabeth, New Jersey, and thereafter at the Rutgers Extension School. Mr. Samuel Martin, principal of the Vocational School, testified that during his whole teaching experience at the Vocational School, he had never seen any indication that defendant was under the influence of intoxicating liquor.
In our judgment the evidence does not warrant the conclusion that her husband's conduct endangered Mrs. Lehmann's life or health or that her life was one of such extreme discomfort or wretchedness as to incapacitate her, physically or mentally, to discharge her marital duties, or that they should not live together. Consequently, under the rule of Fallon v. Fallon, supra, she has not successfully maintained her cause of action.
The Chancery Division in its memorandum did not discuss the testimony proffered by the defendant in support of his counterclaim. The implication, however, is that it did not deem the evidence sufficient and directed its dismissal. Our review of that testimony convinces us of the propriety of the dismissal.
*242 With respect to the monthly support awarded to plaintiff for herself and child, in view of our reversal of the plaintiff's judgment, the question of the amount of support for the daughter should be determined. We think the payment of the sum of $65 per month for the child's support should continue if the parties remain separate and apart. The parties may apply to the Chancery Division for a modification thereof, if they choose to do so.
We are persuaded that the sum of $2,500 awarded to plaintiff for counsel fees and costs is excessive, and direct that it be reduced to $1,500.
The judgment of the Chancery Division is reversed insofar as the plaintiff's action for separate maintenance is concerned and modified as follows: the allowance of $2,500 for counsel fee and costs is reduced to $1,500; the allowance of $350 per month for alimony is reduced to $65 per month for the daughter's support in the event the parties continue to live apart; and the direction for payments on the principal and interest on the mortgages is eliminated. The dismissal of the counterclaim is affirmed.
The cause is remanded for the entry of a judgment not inconsistent with the foregoing opinion.