38 N.J. Super. 6 (1955)
118 A.2d 36
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
EDWARD CHARLES TAYLOR, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 12, 1955.
Decided October 26, 1955.
*12 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Morton Stavis argued the cause for appellant (Mr. J. Mercer Burrell, attorney).
Mr. Myron W. Kronisch, Legal Assistant Prosecutor, argued the cause for respondent (Mr. Charles V. Webb, Jr., Essex County Prosecutor, attorney; Mr. Kronisch on the brief).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendant was charged by Officer DiOrio of the Newark Police Department with (1) assault and battery upon DiOrio at West and William Streets, Newark, in violation of N.J.S. 2A:170-26; (2) uttering loud and offensive language at 126 Springfield Avenue, Newark (across the street from West and William Streets) in violation of N.J.S. 2A:170-29(1); and (3) interfering with DiOrio in the lawful discharge of his duties, in violation of section 20.24 of the Revised Ordinances of the City of Newark (1951)  all of the alleged offenses occurring on August 23, 1954. After trial, the Municipal Court of Newark found defendant guilty on all three charges and imposed the following sentences: $50 fine, a suspended sentence of one year, and probation for one year, on the assault and battery charge; $50 fine for loud and offensive language, and $50 fine for interfering with a police officer. Defendant appealed to the Essex County Court which, after a trial de novo without a jury, found him guilty as charged and imposed a nine-months' jail sentence for assault and battery, a similar sentence (to run concurrently) for using loud and offensive language, and suspended sentence on the charge of interfering with an officer. Defendant thereupon appealed to this court claiming that the record does not support the convictions, there being no proof of guilt beyond a reasonable doubt.
The case arises out of a series of incidents occurring in front of 126 Springfield Avenue and across the way at West and William Streets in Newark about 12:30 on the morning *13 of August 23, 1954. There is an extreme variation, if not a complete contradiction, between the testimony of the two Newark police officers involved and that of defendant and his four supporting witnesses. As to the charge of loud and offensive language, we may fairly summarize the proofs by saying that we have defendant's word, almost entirely uncorroborated, against that of the police officers, equally unsubstantiated except in the light of possible inferences flowing from subsequent events. Insofar as the charge of police interference is concerned, the issue again stands pretty much on the unsupported word of defendant as against the police story; resolution of that issue depends upon what the trial court was entitled to find from the evidence that defendant and the police officers did and said to each other in front of 126 Springfield Avenue on the occasion in question.
So far as the assault and battery charge is concerned, however, defendant's position has substantial support in the testimony of his witnesses and the circumstances surrounding the happenings of that early morning. The case for the State, on the other hand, rests exclusively on the version given by the policemen, a version  as is pointed out in defendant's careful analysis of the testimony  attended by a number of improbabilities, contradictions and circumstantial weaknesses. The essential question posed is whether these weaknesses, in the light of the strength of the defense, are sufficiently pervasive to overbalance the weight which we must give to the opportunity of the trial court to observe the witnesses and thereby judge of their credibility  in short, whether the case as a whole was such that a fact-finder could conclude from the evidence that defendant was guilty beyond a reasonable doubt. Defendant also urges that we consider possible bias on the part of the police witnesses, and the soundness of the oral conclusions of the trial judge.
A full appreciation of the proofs requires that we note at once that the police officers involved in this case, and their witnesses, are white; defendant and his witnesses are all Negroes. The scene of the occurrence is in a predominantly Negro neighborhood.

*14 I.
A detailed account of the conflicting testimony is necessary for a proper understanding of the problems posed by the record and essential to our resolution of the appeal.
The police version of the episode is substantially this: Officers DiOrio and Ferrante of the Newark Police Department were patrolling their beat shortly after midnight when they noticed a group of people, all Negroes, congregated around a parking meter at Springfield Avenue and West Street where their automobile was parked. There had been numerous complaints about thefts from parking meters, and so they walked across the street to investigate. While they were talking to the group and had just about satisfied themselves there was nothing wrong, defendant came upon the scene and pushed his way into the center of the group, demanding to know what was going on. Upon being asked whether he belonged with the group defendant said he did not, whereupon he was told that this was police business and he should be on his way. There is some variation in the testimony of the officers as to which of them first engaged Taylor in conversation and told him to move on. When defendant then said he was going to make it his business, he was again told to leave. He refused, telling DiOrio that "no little [obscenity] cop was going to tell him what to do." DiOrio said he was not going to stand for that kind of talk, to which defendant replied that the only reason the officers had stopped and questioned the people was because they were colored, and the only reason for telling him to move on was because he was colored. He added: "You cops have been getting away with this [obscenity] long enough." He spoke of having very influential friends, said he was going to bring the officers up on charges, and demanded their badge numbers. DiOrio then told defendant he was under arrest. It was at about this time that Ferrante sent the group under investigation, then seated in their car, on their way; the car drove off. DiOrio proceeded to arrest defendant by seizing his arm. Taylor, who was six feet tall and weighed *15 300 pounds, jerked or thrust his arm in such a manner as to send DiOrio, who was some four inches shorter and weighed 149 pounds, sprawling to the ground. Thereupon Ferrante, who was six foot two and weighed 255 pounds, grabbed defendant's arm in a hammerlock, and the two officers then escorted him across the street to a police callbox at the intersection of West and William Streets and Springfield Avenue. Ferrante's testimony was that defendant was belligerent and had to be restrained as they crossed the street; DiOrio said he went quietly.
The police account continues, that on reaching the intersection Taylor was ordered to face a wall located some 10 or 15 feet from the callbox, raise his hands above his head and place them against the wall. Ferrante proceeded to put in a call for the patrol wagon, while DiOrio, standing in back and a little to the right of defendant, began to search him. Suddenly defendant turned around, striking DiOrio's neck with his left forearm and again knocking him to the ground. Taylor started to run in the direction of Ferrante, who tried to stop him and then hit him with two "judo chops," delivered with the side of the hand, one against the jaw and the other to the back of the neck. Defendant went face-down on the ground. Ferrante picked him up and saw that his face was bloody. Shortly thereafter the patrol wagon arrived. Two of the policemen on the wagon also testified that defendant's face was bloody.
DiOrio testified that when defendant struck and knocked him down the second time he said, "You can't lock me up." He admitted, however, that he testified in police court that the remark made by defendant at that time was a repetition of the obscene epithet ascribed to him in front of 126 Springfield Avenue; also that Ferrante rescued him from defendant, rather than that defendant ran into Ferrante. Ferrante testified that he did not hear defendant say anything at all at the corner of West and William Streets, although he claimed to have seen him strike DiOrio.
Defendant's version differed completely from that of the officers. He lived only a few houses from the scene, at 136 *16 Springfield Avenue. On the night in question he was walking to a nearby restaurant when he noticed a number of people across the street, looking at a car parked on his side, in front of No. 126. Two policemen were looking in through the open doors of the car, in which five or six people were seated. As he came abreast of the car, he slowed his pace and out of curiosity leaned down and peeped into the car to see what was going on. DiOrio saw him and shouted to him to move on, "Beat it," and Ferrante asked him whether he had anything to do with the people in the car. He said "No"; he denies saying he was going to make the affair his business, or that he went over to the curb where the car was parked. Ferrante then said, "Well, get the hell along," whereupon defendant continued on at a very slow pace, but he did not stop. He testified that Ferrante rushed over and pushed him on both shoulders saying, "Get the hell along," to which he replied that he didn't think Ferrante should push him and that as a citizen it was the officer's duty to protect him rather than abuse him. Contrary to the officer's testimony, he denies that he threatened disciplinary action. Ferrante then grasped him by the collar of his sport shirt, pushed him a few feet up the street and said, "You want to be a smart s.o.b. [using the words]? We'll take you to the Fourth Precinct." The officers told him to raise his hands and searched him; he did not resist. Just before this the officers had indicated to the people in the car that they should leave, and they did.
Again contradicting the officers, defendant denied he said he had influential friends downtown or that he asked for their badge numbers. He also denied using the offensive language to which the officers testified or that he had said they were discriminating against him and the people in the car because they were colored. He further denied that he pulled his arm from DiOrio's grasp or that DiOrio had fallen to the sidewalk at any time in front of 126 Springfield Avenue. He said that after he had been searched he and the officers proceeded across the street to the corner of West and *17 William Streets. Ferrante did not have a hammerlock on him, but held him tightly by the sleeve until they reached the opposite curb, when he let go of him. Ferrante then ordered him to put his hands against the wall and he stood there with DiOrio behind him while Ferrante put in a call for the patrol wagon. Defendant saw several people nearby  Mrs. Smart, Mr. Jones and Mr. King, who appeared as defense witnesses.
While defendant was standing at the wall Ferrante asked him for identification and he showed his driver's license. Ferrante also asked him whom he knew and he said he knew quite a few people around. Defendant was then asked what organizations he belonged to and he said he was interested in labor. He denied the entire story of swinging around and striking DiOrio, or attempting to run away, or of having been struck in any manner by either of the officers. He said they just waited there and nothing happened until the patrol wagon came, and that there was no blood on his face when he got into the wagon. Some time before the patrol wagon arrived, defendant's wife came running across the street. Ferrante asked her where she was going and she told him defendant was her husband and she wanted to talk to him. Ferrante said she could not because he was under arrest and when she insisted he pushed her back, whereupon defendant told her to get a lawyer and she went back across the street. The patrol wagon arrived shortly afterwards.
The significance of the testimony concerning the condition of defendant's face at the time he got into the patrol wagon is that when he was released by the police the next day and made a statement for the purpose of a departmental hearing against the two officers, his face showed evidence of his having been subjected to a brutal assault. He testified  significantly, without contradiction  that his face then was bloody, there were bruises on his shoulders, back, left side and on the right side of his chest, his lips were puffed, his nose injured, his teeth loose, and he could not see out of one of his eyes. His undershirt was bloody. His shirt and *18 hat were missing. Two pictures showing defendant's condition were offered in evidence but rejected by the court on the ground they had nothing to do with the issues. The photographs were apparently submitted in an attempt to show that his condition at the time he gave his statement to the police was such that he could not be held responsible for the accuracy of all that was contained therein. This obviously did not go to the voluntary nature of the statement, and so the pictures were properly rejected. They were apparently offered to bring home to the trial court that defendant was beaten up by the police some time after he got into the patrol wagon. The condition of his face before entering the wagon was, of course, of some materiality in relation to the charge of assault and battery brought against him, because if there was blood on his face at that time there would be support for the police story that defendant had to be subdued by Ferrante and fell to the ground after he allegedly struck DiOrio.
Defendant's story in connection with the assault and battery charge was supported in almost every respect by his witnesses Jones, King and Mrs. Smart. Jones, who said he had not known defendant previously, testified that while he was walking home he noticed the two officers questioning a group of people on the other side of Springfield Avenue. He stopped to watch and saw the police line the people up on the sidewalk and search them. Defendant came along just as they were getting back into their car. Jones, who had been joined by King, saw the officers start talking to defendant as the car drove away, but Jones could not hear what they were saying except for the single utterance "Move on." Defendant put his hands up against the wall and the officers searched him. There was no struggle or resistance whatsoever, then or as defendant and the officers walked across the street to near where Jones and King were standing. Taylor put his hands up against the building near the callbox and never took them down; he did not knock DiOrio down or try to run away. Jones saw Mrs. Smart at the scene, and she left to go across the street. Jones left before *19 the patrol wagon arrived; at that time there was no blood on defendant's face.
Defendant's second witness was King, whose hearing was somewhat impaired. He was acquainted with defendant. He testified that he had parked his car, with his young son in it, at the corner of West and William Streets when he noticed the car across the street near the parking meter and saw a number of people standing near the building with their hands up while DiOrio was searching the car. When King approached that car DiOrio asked him what he wanted and then told him to "Beat it," whereupon he went across the street to watch from there. He met Jones and discussed the incident. A few moments later he saw defendant come along and slow down as he got near the car. He heard one of the officers say in a loud voice something like "Go ahead and beat it"  this was the only part of the conversation of Taylor and the officers that he heard from across the street. Taylor continued to walk slowly and then one of the policemen caught hold of his arm. It was about then that the people who had been investigated drove off in their car. Taylor was searched and the officers then brought him across Springfield Avenue to the callbox, not far from King. Defendant offered no resistance on the trip across the street, and King saw no hammerlock hold on his arm. He testified that although he was watching closely, he saw absolutely no struggle between defendant and the officers at the parking meter or, indeed, at any other time or place. As the three men came near him, he heard Taylor say: "You are the law. You can do as you please." He testified that defendant did not assault DiOrio and didn't run away from the wall into the arms of Ferrante, nor was he knocked to the ground. King saw Mrs. Smart at the scene and saw her go back across Springfield Avenue and into a building on the other side. Jones left before she returned with Mrs. Taylor. King heard Mrs. Taylor ask for her husband and Ferrante answered that he was under arrest. He saw Ferrante push her back, heard defendant ask her to get a lawyer, and saw her go *20 back across the street. The officers then ordered him to leave; they said "What do you want? Beat it. If you don't want to go where this man is going, beat it." King moved away a short distance. The patrol wagon arrived and King testified that from a distance of only seven or eight feet he could see there was no blood on defendant's face.
Mrs. Smart was living with defendant and his wife at the time of the incident. Her testimony was substantially like that of Jones. She had left the Taylor apartment and gone across Springfield Avenue where she noticed a crowd looking toward the side of the street from which she had come. In the crowd were Jones and King. She saw two policemen looking into a car in which people were seated. It was then that defendant came on the scene, slowing his walk as he approached the car. She heard DiOrio yell at defendant to move on, "Beat it," and saw defendant continue walking past the car without hurrying his pace. She then heard Ferrante shout, "Didn't I tell you to move on?" and saw him walk over to defendant and push him. At this point Mrs. Smart had stepped some six feet out into the street and heard defendant say something like "You shouldn't be pushing me." DiOrio waved the car on and it started up the street; he joined Ferrante who had again pushed defendant, and the two searched him. The trio then proceeded across the street without incident, Taylor walking slightly ahead of the officers. There was no scuffle, no resistance, no hammerlock hold. All she heard Taylor say was, "You are the law. You can do as you please." The officers placed him with his hands up against the wall and he remained there. Jones and King were standing close by, and there were a number of other people whom she did not know. She then left to get Mrs. Taylor in the apartment across the street and soon returned with her. Taylor was still against the wall. Mrs. Smart heard Ferrante tell Mrs. Taylor, when she asked to speak to her husband, that he was under arrest; she saw Ferrante push her, and heard defendant call to her to get a lawyer. Mrs. Taylor then rushed back across the street. Mrs. Smart *21 testified she did not see defendant knock DiOrio down, nor Ferrante strike defendant or knock him to the ground. Standing only a few feet away, she could see there was no blood on Taylor's face when the patrol wagon arrived and he got in. At no time did she hear him speak in a loud voice.
Mrs. Taylor's testimony as to what happened when she was called out of her apartment that night accords with that of King and Mrs. Smart in every respect. While she was on the scene her husband remained standing against the wall. When he turned to look at her there was no blood on his face or shirt.
Both officers denied having searched any of the persons they had interrogated about the parking meter, or their car. On cross-examination they also flatly denied having seen or talked to Jones, King, Mrs. Smart or Mrs. Taylor that night. All this was squarely contradicted by the defense witnesses.

II.
On a review of any cause, whether criminal or civil, involving issues of fact not determined by the verdict of a jury, this court has the power to make new or amended findings of fact, but it must give due regard to the opportunity of the trial court to judge of the credibility of the witnesses. R.R. 1:5-4(b), 2:5. The permissive power so conferred is sparingly exercised. Trusky v. Ford Motor Co., 19 N.J. Super. 100, 103-104 (App. Div. 1952). This court has not hesitated, in cases where the controversial issue was essentially factual, to make its own findings of fact when in its judgment the interests of justice so required. Lehmann v. Lehmann, 7 N.J. Super. 232 (App. Div. 1950); O'Neal v. O'Neal, 9 N.J. Super. 36 (App. Div. 1950); Series Publishers, Inc., v. Greene, 9 N.J. Super. 166 (App. Div. 1950); DeBaro v. Gabryelski, 14 N.J. Super. 50 (App. Div. 1951); State v. Matchok, 14 N.J. Super. 359 (App. Div. 1951); Coles v. Osback, 22 N.J. Super. 358 (App. Div. 1952); Giambattista v. Thomas A. Edison, 32 N.J. Super. 103 (App. Div. 1954). Such is the situation here.
*22 We have provided an extended summary of the evidence in order to point up the absolute contradiction in the testimony of the police officers involved and that of the defense witnesses  a contradiction which extends through almost the full range of events which transpired within a space of little more than ten minutes in the early hours of the morning of August 23. The one determinant in a situation characterized by so contrastive a body of evidence is, of course, the credibility which can be assigned to one side or the other. The trial court stressed that credibility was the real question at stake, and concluded that the two officers were to be believed and the defense witnesses not. The trial judge stated that he had "an abiding conviction to a moral certainty" that the defendant was guilty as charged.
We recognize that the judgment below has every intendment in its favor, just as we recognize the superior opportunity of the trial judge to observe the demeanor of the witnesses and judge of their credibility. Julius Reiner Corp. v. Sutton, 23 N.J. Super. 93, 96 (App. Div. 1952). We are also sensitive to the trial judge's strong conviction, expressed in his quoted conclusion. But the judgment of a trial judge, sitting without a jury, in determining credibility is a subjective judgment. Language like "an abiding conviction to a moral certainty" is impressive, but should not insulate us from observing the many instances of incredible or improbable testimony nowhere satisfactorily explained in the record. If this were so, then language stated with sufficient positiveness could well serve as a mask for the judge's visceral reaction to the personalities of the witnesses, the atmosphere surrounding the case, and many other intangibles that do not find their reflection in the record.
We turn first to the complaints themselves. Defendant was arrested on the morning of August 23, 1954 and taken to the police station. There defendant was "booked" for loud and offensive language and for interfering with an officer. The arrest card carries no reference whatsoever to the assaults and batteries upon DiOrio by Taylor. Why it should not have mentioned the most serious charge that could have been *23 brought against defendant is beyond understanding. It is incredible that if either of the two assaults had actually occurred, the police officers would have waited from August 23 to September 7, 1954 before booking or charging defendant with the crime of assault and battery. It was on the latter date that Officer DiOrio swore to the three complaints here in question. In the meantime, and directly following the occurrence on Springfield Avenue, defendant had made a statement at police headquarters charging DiOrio with brutality; and there was also pending before the grand jury a complaint charging DiOrio with atrocious assault and battery. This matter was pending before the grand jury at the time of the County Court trial, and is still pending.
We find it incredible that the two officers would not have noticed any witnesses to the scene, particularly in the light of the testimony of defense witnesses King and Mrs. Taylor that not only were they there, but the officers spoke to them. We find it beyond the probabilities of common experience that if DiOrio had in fact been knocked to the ground by defendant near the parking meter and it had been necessary to walk defendant across Springfield Avenue under the restraint of a hammerlock, that it would be Ferrante, the much more powerful of the two officers, who would leave him to make a call to the precinct while the smaller DiOrio was left in charge of Taylor. It is, moreover, to be wondered at that defendant was not handcuffed after one or both of the alleged assaults. The happenings at the corner of West and William Streets belie common experience. It is improbable that defendant, while standing with his hands up against the wall, with DiOrio standing behind and to his right, could have with a single thrusting blow of his left forearm, sent DiOrio sprawling. It is equally improbable that defendant, having allegedly knocked DiOrio down for the second time within a space of five minutes, should try to escape by "trotting" directly toward and into the arms of the very policeman who had allegedly just marched him across Springfield Avenue while restraining him with a hammerlock.
*24 There may be explanations for these incredible and improbable elements in the testimony  indeed, the State offers explanations  but considering all of these elements together, they vitiate the officers' testimony and go far toward destroying the credibility that might otherwise be accorded it. As Chief Justice Vanderbilt said in In re Perrone's Estate, 5 N.J. 514, 522 (1950):
"* * * Testimony to be believed must not only proceed from the mouth of a credible witness but must be credible in itself. It must be such as the common experience and observation of mankind can approve as probable in the circumstances. * * *"
And see Gilson v. Gilson, 116 N.J. Eq. 556, 560 (E. & A. 1934), where the court used similar language and went on to say:
"* * * There is no test of the truth of testimony, except its conformity to our knowledge, observation and experience. Improbable testimony is such as imputes conduct inconsistent with those principles by which persons, similarly situated, are governed. * * *"
We are not unaware of the fact that this case, as the trial judge observed, was tried against the distressing background of asserted police brutality and racial prejudice. We recognize that Newark, like other large cities with an increasingly heavy Negro population, must deal and is attempting to deal with the delicate problem of human relations, particularly in the area of law enforcement. The element of brutality must enter into our consideration of the matter because of the potential impact of this pending charge against the police officers on their testimony.
In considering the testimony of the officers, the court observed that they were "entirely natural" on the witness stand and answered questions in a forthright manner. In its opinion, their testimony had the "hallmark of candor and truth." There is a well-known and probably justified tendency by trial courts to accord deference to police officers' testimony where they are not partisans in the trial and appear in their *25 normal role as impartial arms in the administration of justice. But the officers here were under serious charges brought by defendant.
The oral opinion delivered by the court after the close of the hearing would indicate that it proceeded on the assumption that the police were not partisans and self-serving in their testimony. It found no evidence of malice or ill will toward defendant. Wholly apart from their attitude toward defendant on the night of the incident  and in this connection we must consider how the police are said to have treated innocent bystanders like King and Mrs. Taylor  the testimony of the two officers at the trial must undoubtedly have been colored by that type of self-interest which the courts have recognized as removing a witness from the category of the disinterested. The charges of atrocious assault and battery which defendant had filed against them were pending before the grand jury. That these charges are not merely colorable is indicated by the uncontradicted testimony as to defendant's physical condition shortly after the arrest. We cannot ignore this element of interest as affecting credibility; the courts have always recognized the fact that the interest, motive, bias or prejudice of a witness may affect his credibility. See State v. Salimone, 19 N.J. Super. 600, 608 (App. Div. 1952); cf. State v. Steensen, 35 N.J. Super. 103 (App. Div. 1955).
The trial court posed for itself the question of whether, after charges were made against the officers by defendant, they had not brought the complaints in this case and made up a story so they would have a defense to that action. It answered the question in the negative, sub silentio, but did not consider objectively two undisputed facts already referred to: the failure of the arrest card to mention defendant's two alleged assaults upon DiOrio, and the fact that he was not charged with assault and battery until two weeks after he had filed his own charges of atrocious assault and battery against them. The record is silent as to any consideration given by the trial court to the significance of these documented facts.
*26 The trial judge stressed the conduct of the officers on the witness stand, their naturalness and their direct answers to questions. No special weight can be given to such conduct in itself; police officers regularly have business before municipal courts and often appear in the County Court, particularly in a metropolitan county. The observation regarding the officers' conduct on the stand comprises the court's entire summary of their testimony. It did not attempt to analyze  in fact it made no reference to  the several instances of incredible or improbable assertions made by them and to which we have already referred. Broad as the powers of a trier of facts may be in weighing credibility, he may not apply them in such a manner as to accept out of hand any story told by police officers  no matter how incredible or improbable and substantially refuted by other witnesses and circumstances such story may be  purely on the basis of an entirely subjective determination as to the demeanor of the policemen.
The trial court applied a far stricter standard in assessing the credibility of the defense witnesses than it did in the case of the officers. It observed, for example, that the witnesses were on guard; although defense counsel asked perfectly proper questions it seemed that the witnesses were waiting for the next question so as to go on with their story. In short, there was an element of disbelief because they did not volunteer unresponsive answers to questions. We find the answers they gave were directly responsive to the questions asked; had they volunteered unresponsive answers, their replies would of course have promptly been stricken. They were complying with the most elementary duty of witnesses in answering questions at a trial. And if, as the court observed, they were "ill at ease," we find nothing strange in this. Lay witnesses generally, and particularly Negro witnesses testifying in direct contradiction to police testimony, would naturally be expected to display some nervousness in the unfamiliar atmosphere of a courtroom in a criminal proceeding.
*27 The court found the testimony of Jones something less than adequate because it appeared he was too observant and, further, because he left the scene before the patrol wagon arrived. There is no valid basis for discrediting Jones' unimpeached testimony because he left the scene when he did. The record is replete with testimony that the officers were telling those on the scene to "beat it" if they too didn't want to get locked up. Jones may have finally acted on that suggestion, or departed the place for some perfectly valid reason of his own.
King's testimony was discredited merely because he was somewhat hard of hearing. In the first place, his testimony dealt overwhelmingly with what he had seen, and not what he had heard. That he could hear reasonably well is revealed by the record; never in the course of his extensive and rigorous examination was any question repeated for his benefit. He referred to only two things he heard on the scene. "Beat it" were words which, he said, were "spoken louder than any other words at that time." As for hearing defendant say, "You are the law. You can do what you please," this was said when King was standing near him.
Defense witnesses were disbelieved because they seemed to remember precisely what they saw. This was so as to Jones and King, and again in the case of Mrs. Smart who, the court observed, "knows the exact position of everyone involved in this case." It is difficult to comprehend the basis upon which a witness' unimpeached recollection of what he had seen may be dismissed as incredible merely because he recognized having seen it. The court was critical because Mrs. Smart "hedged" on a relatively insignificant point in the testimony concerning the position of King's son during the incident. The record does not substantiate that she "hedged" or was "cagey." The court also said that she became "flustered" when she admitted she was mistaken about which officer shoved the defendant. Her testimony on this point never varied; it was Ferrante who did the shoving. What the court was apparently referring *28 to was her testimony as to which of the officers first told defendant to "beat it" when he came on the scene. She first said it was the larger (Ferrante); on cross-examination she said it was the smaller (DiOrio), and if she stated otherwise, she had been mistaken. It may be observed that the officers themselves were inconsistent as to which one had first told Taylor to "beat it."
As for defendant, the court appears to have disbelieved him because of minor variances between his testimony and the statement he gave the police in complaining against the officers. The testimony was that this statement had been made while defendant was suffering intense pain from his then physical condition. The minor discrepancies were not such as, in our opinion, merited disbelief of his testimony.
For all the reasons indicated, we are of the opinion that the court below erred in finding that the State had proved beyond a reasonable doubt that defendant was guilty of the alleged assault and battery.

III.
As to the charge that defendant used loud and offensive language in saying to DiOrio, "No little [obscenity] cop like you is going to tell me what to do," we have only the testimony of the two police officers as against that of defendant. Neither side had corroboration. The trial judge had to resolve the flat question of credibility.
The charge was made immediately after defendant was brought to the police station; as noted, he was booked for this and for interfering with an officer in the lawful discharge of his duty. The considerations discussed in connection with the assault and battery charge do not apply with equal force here.
The trial judge was warranted in determining the issue in favor of the State. Defendant does not argue that the State's evidence, if believed, does not establish the charge. We find that the language used was both loud and offensive *29 N.J.S. 2A:170-29(1); Mullen v. State, 67 N.J.L. 451 (Sup. Ct. 1902); State v. D'Aloia, 146 A. 426, 2 N.J. Misc. 1164 (C.P. 1924).

IV.
We deal, finally, with the charge that defendant, in violation of the Newark ordinance, interfered with Officer DiOrio in the lawful discharge of his duty. The ordinance reads that it shall be unlawful for any person to "in any manner interfere with * * * any member of the police force * * * in the lawful discharge of his duty." If we accept defendant's testimony (the testimony of the other defense witnesses threw little light, aside from the alleged assault, upon what happened in front of 126 Springfield Avenue between Taylor and the officers), then what he did would amount to nothing more than, as he describes it, showing the "normal interest of the citizenry in what the police are doing." But there appears to have been more than merely the asking of a question as to what was going on. It would appear that the police had not quite completed their investigation of the group near the parking meter when defendant came upon the scene. Defendant asked what was going on, was in turn asked if he belonged to the group, and replied he did not. He was directed to go on his way and he refused  in words (if we believe the police) and by his actions. All the evidence is in agreement on the fact that he moved away slowly, if at all. The officers' testimony was that he said he intended to make police business his business and that they were discriminating against the group under investigation and him only because they were colored.
In our view, this conduct constituted the prohibited interference with the police officers in the performance of their duties. It is not a question, as defendant contends, whether they were actually prevented from performing their duties. The ordinance does not require such a showing. The question is solely whether they were interfered with. *30 Such interference occurs if what defendant did was calculated in any appreciable degree to hamper or impede the police in the performance of their duties as they saw them.
"* * * The duty of police officers, it is true, is `not merely to arrest offenders, but to protect persons from threatened wrong and to prevent disorder. In the performance of their duties they may give reasonable directions.' People v. Nixon, 248 N.Y. 182, 188, 161 N.E. 463, 466. Then they are called upon to determine both the occasion for and the nature of such directions. Reasonable discretion must, in such matters, be left to them, and only when they exceed that discretion do they transcend their authority and depart from their duty. The assertion of the rights of the individual upon trivial occasions and in doubtful cases may be ill-advised and inopportune. Failure, even though conscientious, to obey directions of a police officer, not exceeding his authority, may interfere with the public order and lead to a breach of the peace." People v. Galpern, 259 N.Y. 279, 181 N.E. 572, 83 A.L.R. 785 (Ct. App. 1932).
Failure to obey a police order to "move on" can be justified only where the circumstances show conclusively that the order was purely arbitrary and was not calculated in any way to promote the public order. As was said in the Galpern case, the courts cannot weigh opposing considerations as to the wisdom of a police officer's directions when he is called upon to decide whether the time has come in which some directions are called for.

V.
Defendant complains of the harshness of the sentences imposed by the County Court in contrast to the $50 fines imposed in the municipal court. On appeal the County Court on a trial de novo has the power to impose such sentence as is provided by law. R.R. 3:10-10(e); State v. Elliott, 13 N.J. Super. 432 (App. Div. 1951). Before imposing sentence the court here called for a pre-sentence investigation, R.R. 3:7-10(b), but the record does not show what it may have revealed. The sentences themselves were proper under the general penalty clause relating to disorderly persons, N.J.S. 2A:169-4.
*31 The County Court judge may or may not, in his sound discretion, wish to give consideration to the question as to whether the result of this appeal calls for a modification of the sentences on the convictions here sustained.
The convictions for loud and offensive language and interfering with an officer are affirmed. The conviction for assault and battery is reversed.