46 N.J. Super. 162 (1957)
134 A.2d 409
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOHN RUCKER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued July 22, 1957.
Decided August 16, 1957.
*164 Before Judges HALL, McGEEHAN and BROADHURST.
Mr. John Wallace Leyden, Jr., argued the cause for appellant (Messrs. Leyden & Monaghan, attorneys).
Mr. Thomas S. O'Brien, Special Assistant Prosecutor, argued the cause for respondent (Mr. Guy W. Calissi, Bergen County Prosecutor, attorney; Mr. William C. Brudnick, Special Assistant Prosecutor, on the brief).
The opinion of the court was delivered by HALL, J.S.C. (temporarily assigned).
Defendant appeals from a judgment of conviction in the Bergen County *165 Court, following a trial without a jury, on an indictment charging a violation of N.J.S. 2A:121-3(b). This section makes any person guilty of a misdemeanor who "knowingly possesses any paper, document, slip or memorandum that pertains in any way to the business of lottery or lottery policy, so-called, whether the drawing has taken place or not." The only questions presented to us are whether certain printed cards found on the defendant's person fall within the coverage of the statute and whether the State was required to prove, as an essential element of the crime, the existence of an actual lottery related to the items in defendant's possession, in the light of N.J.S. 2A:121-5.
The State's evidence showed that on August 8, 1956 defendant, who had been under surveillance by the Hackensack police department for at least the two preceding days, apparently on suspicion that he was engaged in the lottery or numbers business in some fashion, was asked by two members of the force to come to police headquarters. Found in his wallet there were five cards, three of one kind being identical and two of another kind being substantially so. The defendant testified that these cards were not in the wallet, but in his pocket held together by a rubber band, when he was asked to remove the contents of his clothing by an officer at headquarters, and that thereafter he placed the cards in the wallet at the direction of the officer. This variation in the testimony makes no difference on this appeal.
The three identical printed cards read:
 "AS OF THIS DATE
 AUGUST 6, 1956
 The Numbers will be taken from the Total
 Mutuel Handle."
Then followed an example, under a heading of that word, consisting of a seven digit number with arrows over and pointing to the fourth, sixth and seventh digits, with this language printed below the number:
*166
 "1st One Fourth from RIGHT
 Last Two As Arrows Indicate"
One of the other two printed cards read:
 "BEGINNING JANUARY 3, 1956
 THE FOLLOWING Nos. are CUT
 4 to 1"
Then followed two lines of three digit numbers, three on the first line and six on the second. Those on the first line were each followed by the capital letter "C." The second of these cards was substantially identical, although in different type, except that the middle of the three numbers on the first line of the first card was omitted, one of the words was misspelled and there was no "s" on the word "Nos."
A Bergen County Prosecutor's detective, testifying as an admitted gambling expert, said that the first three identical cards were used in the operation of a "numbers business" to show how the winning number will be determined (from the daily publication of the total bet at a race track) and that the other two cards were known in the business as "cut number cards" or "cut cards," indicating for the information of players and "runners" that the numbers listed on the cards having been the winning number more often than other numbers, the odds in "paying off" on such numbers would be reduced from the normal 600 to 1 to 400 to 1. He further stated that the significance of the capital letter "C" printed after certain of the numbers on the cards indicated a combination number, which meant that the "cut" in the odds applied to any number made up of any combination of the digits. His opinion that these cards were used in a numbers operation by, or for the information of, a "runner," "banker" or player was not contradicted. All such expert evidence was entirely proper. State v. Smith, 21 N.J. 326, 334 (1956). He characterized the cards as "memoranda" and not "slips," as far as the language of the statute is concerned. There can be no doubt that the "numbers business," so-called, falls within the classification of "lottery or lottery policy."
*167 The defendant was the only witness in his behalf and his testimony related principally to an attempted explanation of his possession of the cards. His story was that he, a resident of New York City, came to Hackensack in the early morning of the day in question and went to the home of his wife in the latter city; that on leaving his wife's home he noticed the cards, encircled by a rubber band, lying in front of the house by the door, and that he picked them up, as he was accustomed to picking up "anything that looks interesting," and stuck them in his pocket. He contended he did not know what they were until he was advised by the police officers at headquarters, although his seeming familiarity with some of the terminology of the business would indicate his ignorance was not as deep as he professed. He denied that he had ever "taken numbers" or been guilty of any "numbers crimes" but he was not asked whether he was a numbers player or bettor.
At the conclusion of the case the judge made a general finding of guilt, referring to the cards as "memoranda." There was no request to find the facts specially (R.R. 3:7-1(c); see State v. Catalano, 30 N.J. Super. 343, 347 (App. Div. 1954)), but the court also made what might be said to amount to a special finding relative to knowing possession and criminal intent, aptly describing the defendant's explanation as incredible and ridiculous. No question is raised here on that score.
Defendant, in his brief, phrases his concept of the primary issue on the appeal in this language: "* * * whether the legislature intended to make it a crime for anyone to possess any item however remotely connected with the lottery business, or whether it intended to make criminal only the possession of papers by one taking bets which are directly connected to a specific game."
While the general principle is clearly established that a criminal statute is to be strictly construed, such construction must not be unduly narrow or artificial or disregard manifest legislative intention. State v. Friedman, 135 *168 N.J.L. 419, 421 (Sup. Ct. 1947), affirmed 136 N.J.L. 634 (E. & A. 1948).
The general policy of the State toward gaming and a particular form thereof is not to be overlooked in ascertaining the purpose and scope of a particular statute or language therein. Our Constitution of 1844 originally provided:
"No lottery shall be authorized by this state; and no ticket in any lottery not authorized by a law of this state shall be bought or sold within the state." Art. IV, sec. VII, par. 2.
By amendment in 1897, the prohibition was extended to "pool-selling, book-making or gambling of any kind," and it was further specified that no gambling device, practice or game of chance then prohibited by law should be legalized, nor the remedy, penalty or punishment then provided therefor in any way diminished. The amendment in 1939, legalizing pari-mutuel horse race betting, at the same time strengthened the prohibitory language relating to all other types of gambling by including therein roulette and games of chance "of any form."
The Constitution of 1947 continued the prohibition (Art. IV, Sec. VII, par. 2) in the widest possible language,  "No gambling of any kind shall be authorized by the Legislature"  unless heretofore or hereafter submitted to and authorized by the voters at an election and excepting bingo and raffles for broadly charitable benefits after approval by the local electorate.
Beside our various criminal statutes penalizing gaming of specific kinds, the Legislature many years ago, as a further expression of public policy and a deterrent to gambling of all sorts, declared unlawful, "all wagers, bets or stakes made to depend upon any race or game, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event" (Rev. 1877, p. 458, sec. 1, now N.J.S. 2A:40-1), and imposed civil consequences, even to the extent of permitting recovery by bettors, to discourage operation of gaming enterprises. (N.J.S. 2A:40-2 et seq.)
*169 Our Supreme Court has forcefully commented that New Jersey "has long been committed through constitutional prohibitions to an `all embracive' policy against all forms of gambling, except as specifically sanctioned * * *." State v. Hozer, 19 N.J. 301, 308 (1955). The design of specific criminal statutes is to enforce that policy and they must be interpreted in that light.
With particular reference to lottery statutes, our Supreme Court has said that they should be construed by looking first at the mischief to be remedied and then to the legislative means taken to achieve that end. Lucky Calendar Co. v. Cohen, 19 N.J. 399, 410 (1955), opinion adhered to on rehearing, 20 N.J. 451 (1956). As the late Chief Justice commented in that opinion (19 N.J. at page 410): "Of all of the forms of gambling, lotteries have been the most condemned by the courts" for their anti-social effects in comparison with ordinary gambling by reason of the lure of the chance for "easy money" appealing to "the weakness of those whom the statute aims to protect, primarily for the benefit of society in general." His observation that "[s]o myriad are the forms that lotteries have assumed, so varied the subterfuges attempted to bring them within the letter of the law that our Legislature has been driven to use the broadest terms in describing the crime" (19 N.J. at page 411), is equally applicable to statutory means enacted to suppress the evil by striking criminally at all phases of and all persons in any way connected with or touched by it.
Thus our statute relating to lotteries (N.J.S. 2A:121-1 to 5, inc.) on its face goes beyond most of our other penal gaming laws (N.J.S. 2A:112-2 to 8, inc.) with respect to the inclusion of those condemned as violators. Not only is one who gives, barters, sells or otherwise disposes of a lottery ticket, or any share or interest therein, guilty of a misdemeanor, but also one who insures against the drawing of any ticket or number or receives money or anything of value in consideration of an agreement to repay in money or goods, or agrees to pay in money or goods, upon an event or contingency dependent on the drawing of a ticket or *170 number (N.J.S. 2A:121-1). Equally guilty is he who directly or indirectly advertises a lottery or anything about it or who prints, brings into the State or distributes any such advertisement (N.J.S. 2A:121-2), or who knowingly works in any capacity in any room or office where lottery slips, copies of numbers or lists of drawings are printed, kept or used in connection with the business (N.J.S. 2A:121-3(a)). Likewise the owner of a building who knowingly permits his premises to be used for the business (N.J.S. 2A:121-3(c)) and one, either individual or common carrier, who knowingly transmits or carries a drawing or list of numbers drawn or receives such from any other person (N.J.S. 2A:121-4). And, of course, we have the sweeping possession section (N.J.S. 2A:121-3(b)) with which we are concerned.
Intended broad scope of the language involved is also demonstrated by the long legislative history of our lottery statutes showing continuous effort since the original act of February 13, 1797 (Patterson's Laws of New Jersey, p. 227; Rev. 1820, p. 272) to suppress the evil by adding further specific crimes as operators' ingenuity and mechanical inventions and progress required. The violation for possession of papers, documents, slips and memoranda first appeared, as a felony, in 1894 (L. 1894, c. 204, sec. 4, p. 311). It was reenacted as a misdemeanor in 1895 (L. 1895, c. 293, p. 593), omitted from the 1898 revision of the Crimes Act (L. 1898, c. 235, secs. 57 to 59, inc., p. 809) and readopted the next year (L. 1899, c. 87, p. 214) as a high misdemeanor. It remained in that category through the Revised Statutes of 1937 (R.S. 2:147-3) until made a misdemeanor in the enactment of Title 2A. The language of the present section is substantially the same form as when originally enacted.
Additionally, and in aid of the same policy, the Legislature in 1933 (L. 1933, c. 368, p. 1010), now found in N.J.S. 2A:170-18, made the possessor of the same classes of materials on the person or in an automobile a disorderly person. This lesser offense does not require proof of corrupt or evil intent, although knowing possession is still an essential *171 element. State v. Labato, 7 N.J. 137, 149-150 (1951). The object of this statute "is plainly to strike at the evil in its inception by a measure that is primarily preventive in character." State v. Murzda, 116 N.J.L. 219, 226 (E. & A. 1935).
In the light of the obvious objects of the law, we find no warrant for saying, as defendant urges, that N.J.S. 2A:121-3(b) extends only to possession by one taking bets. The section makes "any person" guilty. We see no reason to doubt that it means what it so plainly says. Defendant falls within the category.
He further suggests such a construction would make a lottery or number player or bettor guilty of a crime, contrary to what is said to be the general legislative policy not to punish the bettor. While the question is not specifically in issue since defendant is not charged simply with betting or playing, nonetheless it would seem that a lottery player might well be said to violate the section if he had in his possession a slip, receipt or memorandum of his bet given him by the party with whom he had placed it. Such would certainly pertain to the business of lottery. Nor do we find any expression of all embracing legislative policy in our criminal gaming laws against holding any bettor to be a violator. It is not contended, nor could it be, that the Legislature is without power to so prescribe. In fact it has made any person "playing for money or other valuable thing at cards, dice or other games," including slot machines and other devices, guilty of a misdemeanor. N.J.S. 2A:112-1. The fact that the Legislature has not seen fit to make the bettor in every kind of gambling liable for a crime, as, for example, in connection with bookmaking (N.J.S. 2A:112-3), does not permit the courts to overlook or construe away those instances where a statute does, in some circumstances at least, plainly encompass the player as a violator. As was said by Justice Case on this subject, in relation to bookmaking, in his concurring opinion in State v. Lennon, 3 N.J. 337 (1949): "It is for the courts *172 to pronounce and construe the law, not to make it." (at page 346).
We are also convinced that defendant's proposed construction limiting the words "paper, document, slip or memorandum" to mean only betting slips, tickets, policies or memoranda of a particular transaction made in connection with or issued out of a specific lottery departs from the legislative intention. Such an interpretation would be in complete disregard of the broad language following: "that pertains in any way to the business of lottery or lottery policy." And where a statutory phrase is too plain, in its context, to admit of construction, there is no room for the application of any special or technical rules of interpretation. 50 Am. Jur., Statutes, secs. 248-250. The Court of Errors and Appeals specifically said, in State v. Murzda, supra, that the listed categories are used "in the broad generic sense" relating to "things that are mere incidents to the attainment of the unlawful plan or purpose" (116 N.J.L. at page 225).
The particular cards in defendant's possession certainly pertained in a substantial way to the lottery business; they obviously had no other possible use or purpose. The first group of three gives the basis for selection of the winning number and connotes a change in the method of ascertainment as of the date mentioned (two days before they were found on defendant); the second group announces different odds on certain numbers, indicating a change made therein some seven months earlier. The existence of some particular, but unidentified, continuous daily lottery is clearly to be inferred from their face. They are not a mere advertisement or prospectus, the type of thing which might be found in the possession of an innocent person unconnected with the business either as operator, employee or bettor. Both types of cards are essential for the information of bettors and for the business activity of a bet collector or "runner" in dealing with, and to pass on orally to his "customers," or more likely, to distribute to them for future individual use in selecting numbers to be bet. The fact *173 that defendant had more than one of each kind of card is significant. Such seems most unlikely if he had no connection with the business.
We, therefore, hold that this defendant in possessing these particular five cards in the circumstances was guilty of violating the statute. While the State's expert witness and the judge in his finding referred to them as "memoranda," such a denomination does not affect the conviction, even though some of our cases have loosely spoken of "memorandum" in this connection as synonymous with or akin to a lottery slip or book. E.g., State v. Collins, 63 N.J.L. 316, 318 (E. & A. 1899). The cards are certainly "papers," if not "memoranda." Defendant was indicted for possession of all the broad statutory classifications of contraband material in the conjunctive. The State's case is not dependent on any opinion expressed by a lay witness on which of the statutory categories the material technically fell into. Assuming the trial court's use of "memoranda" to be a finding of fact, we have power to make a new finding (R.R. 1:5-4(b)) and we do not hesitate to do so here since the interests of justice so require. State v. Taylor, 38 N.J. Super. 6, 21 (App. Div. 1955).
There is no merit in defendant's contention that the State's case failed because it did not prove the existence of some specific lottery to which the cards related. The prosecution was relieved of any such obligation by N.J.S. 2A:121-5:
"It shall not be necessary, upon the trial of an indictment or accusation for violation of any of the provisions of this Chapter [which includes N.J.S. 2A:121-3(b)], to prove (a) the existence of a lottery in which any ticket, share or part of a ticket is purported to have been issued, * * * or (d) the existence of a lottery in which any number or numbers may be charged to have been issued * * *." (Emphasis added)
This section, on the statute books at least since the 1898 revision of the Criminal Procedure Act (L. 1898, c. 237, sec. 52, p. 884), is another indication of legislative action *174 to aid the successful prosecution and extermination of lotteries. It should be given an interpretation consistent with its object and general policy. The operators of such unlawful enterprises naturally do not publicize their names or addresses of their headquarters. Were it not for this statutory section, it is doubtful that there could ever be a successful prosecution against a present day "numbers game" for any offense under the chapter at any level except possibly that of the owner and main operator. It was held more than a half-century ago in a case under the possession section, involving papers with such obscure notations thereon that expert evidence was required to identify them as pertaining to the business of lottery, and in which the statute was not even mentioned, that no proof of the existence of an actual, particular lottery was required to sustain a conviction. The court commented that there would be a violation even if the alleged lottery was only pretended and a fraud. State v. Arthur, 70 N.J.L. 425 (Sup. Ct. 1904). Moreover, in our case, as we have said, these cards could have only one purpose and use, and that not an innocent one; they bespeak on their face connection with a lottery and therefore the existence thereof.
The judgment is affirmed.