121 N.J. Super. 525 (1972)
298 A.2d 84
DOROTHY ANSLINGER, ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF ALFRED ANSLINGER, AND DOROTHY ANSLINGER, ADMINISTRATRIX OF THE ESTATE OF ALFRED ANSLINGER, PLAINTIFF-APPELLANT,
v.
MARTINSVILLE INN, INC., A NEW JERSEY CORPORATION; FRANK L. GRIER II, MCLEAN TRUCKING COMPANY, A FOREIGN CORPORATION DOING BUSINESS IN NEW JERSEY, AND CHESAPEAKE & OHIO RAILROAD CO., A FOREIGN CORPORATION DOING BUSINESS IN NEW JERSEY AND T/A CABOOSE CLUB, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 24, 1972.
Decided December 11, 1972.
*528 Before Judges LEWIS, CARTON and MINTZ.
*529 Mr. Richard J. Levinson argued the cause for appellant (Messrs. Levinson, Conover, Fink and Axelrod, attorneys; Mr. Andrew M. Rockman, of counsel).
Mr. Herbert C. Klein argued the cause for respondent, Martinsville Inn, Inc. (Messrs. Krieger and Klein, attorneys; Messrs. Herbert C. Klein and William J. Pollinger, on the brief).
Mr. Charles A. Delehey argued the cause for respondents, Frank Grier, II and McLean Trucking Company (Messrs. Lenox, Giordano, Devlin and Barlow, attorneys).
Mr. Charles W. Hutchinson argued the cause for respondent, Chesapeake & Ohio Railroad Co. (Messrs. Lamb, Blake, Hutchinson & Dunne, attorneys).
The opinion of the court was delivered by CARTON, J.A.D.
The administratix ad prosequendum of the estate of Alfred Anslinger appeals from a judgment of involuntary dismissal granted at the close of her case against the various defendants. Defendants are Martinsville Inn, which operates an establishment under that name at which decedent attended a dinner meeting of the Raritan Valley Traffic Club on the night he died; McLean Trucking Company, whose employees and guests occupied a table at that meeting; Grier, one of McLean's salesmen, and Chesapeake & Ohio Railroad Company, t/a Caboose Club.
Plaintiff's proofs were to the following effect: Anslinger was killed on the night of October 9, 1969 when the automobile he was driving ran into the rear of a truck. Earlier that evening he had attended the dinner meeting at the Inn as a guest of McLean. Anslinger was traffic manager for Carter-Wallace, a concern which did a considerable business with McLean.
Anslinger arrived at the Inn about 6:30 P.M. and sat at the table reserved for McLean's employees and their guests. *530 In accordance with its usual practice for affairs of this kind, the Inn served full bottles of liquor with setups at each of the tables and the guests helped themselves. Three bottles of liquor were purchased for the McLean table at which there were three McLean employees and seven guests.
There was an open bar from 6 to 7 P.M. Dinner was served shortly afterwards.
There was proof that Anslinger had three or four drinks at the table before 10 P.M. and, according to one witness, had had too much to drink by that time. There was proof indicating also that Anslinger had been table-hopping and had other drinks. At about 11 P.M. defendant Grier noticed that Anslinger appeared to be "tight." By that Grier meant that Anslinger was rational, slurring his words, but not incoherently, although obviously he had been drinking.
Anslinger invited Grier to go to the "Caboose Club," an informal association of railroad traffic representatives formed for the purpose of jointly entertaining business contacts. The club was meeting that night at the Red Bull Inn, some five miles away. Grier accepted the invitation because Anslinger was a good customer and because he felt somebody ought to stay with him.
Anslinger and Grier left the Martinsville Inn around 11:30 or midnight. In answer to interrogatories, the Martinsville Inn said that an employee at the door observed all the departing guests and saw "no outward observations of anyone being intoxicated."
Anslinger backed into another car in the parking lot and Grier suggested he leave a note. Anslinger refused and pulled away. Grier followed him to the Red Bull.
There was more to drink at the Caboose Club, which met in a separate suit at the Red Bull. Anslinger continued to imbibe. James Mitchell, a sales representative of defendant Chesapeake & Ohio Railroad Co., described Anslinger's condition there as "bombed." Anslinger became belligerent at the gathering and said he was going home despite urgings that he not drive. A scuffle ensued over Anslinger's keys *531 and by the time he left the suite Anslinger had taken off his coat and shirt. The scuffle continued in the parking lot and Anslinger appeared to collapse in his car. Grier made another unsuccessful effort to convince Anslinger not to drive but could only get his consent to let Grier follow him home. Before they pulled out of the parking lot, Grier pulled alongside Anslinger, got out of his car and reached into Anslinger's car to put the gearshift in park position. Anslinger was in a stupor and did not respond to Grier's suggestion they get a room.
Anslinger pulled out onto U.S. 22 and drove drunkenly in the direction away from his home. Grier flashed his lights and attempted to get Anslinger to follow him onto an exit ramp but Anslinger continued down the highway and rammed into the rear of a truck around 2:20 A.M. Anslinger died as a result of the crash.
Plaintiff contends that the trial court erred in refusing to submit the case to the jury as to each defendant listed above. Her theory of liability as to defendant Martinsville Inn is that the Inn became liable for damages because it served decedent alcoholic beverages after he became intoxicated.
State Regulation No. 20 of the Alcoholic Beverage Control Commission prohibits a licensed liquor dealer, such as the Martinsville Inn, to "sell, serve or deliver or allow, permit or suffer the sale, service or delivery of any alcoholic beverage, directly or indirectly * * * to any person actually or apparently intoxicated, or allow, permit or suffer the consumption of any alcoholic beverage by any such person in or upon the licensed premises." For purposes of determining civil liability this regulation may be taken to have the full force of law. Soronen v. Olde Milford Inn, Inc., 46 N.J. 582, 590 (1966). A violation thereof may constitute negligence by the tavern owner. Rappaport v. Nichols, 31 N.J. 188 (1959).
In Rappaport our Supreme Court held that a tavern owner was liable in damages for the injuries caused by an intoxicated minor who was illegally served liquor by the defendant *532 tavern owner. Soronen followed and extended the Rappaport doctrine, holding that the defense of contributory negligence was not available to tavern owners who served minors or visibly intoxicated individuals.
The prerequisites for liability of tavern owners under these cases appear to be three-fold: (1) the patron must be intoxicated; (2) the tavern owner or its employee must know or should have known he was intoxicated and (3) the tavern owner must serve liquor to the intoxicated person.
Defendant Martinsville Inn did not serve drinks individually to the Raritan Traffic Club on the night of the accident, but, as is common with group affairs, served whole bottles of liquor with setups to each table. The language of Regulation 20 above quoted, however, appears broad enough to apply to such method of service. Serving whiskey by the bottle constitutes one method of allowing the consumption of liquor, and if by intoxicated persons would be a violation of the regulation. Certainly a licensee cannot absolve himself from all responsibility simply by adopting this method of service. This is so although this method of service may not permit the waiter the same opportunity for observing the customer's condition as that of a bartender serving over the bar.
We are of the opinion that such a responsibility exists even if the regulations were not so broadly worded. For example, a licensee could not avoid responsibility by serving whole bottles on the tables and leaving the room unattended. Permitting consumption by an intoxicated person would, we think, be the equivalent of serving him. Plaintiff would not therefore be barred from establishing negligence on the part of the Inn.
However, the burden is cast upon plaintiff of satisfying the jury, not only that the decedent was intoxicated, but also that defendants knew or should have known from the circumstances that decedent was intoxicated when the service occurred. Soronen v. Olde Milford Inn, Inc., supra, 46 *533 N.J. at 593. The trial judge, in granting the Inn's motion for involuntary dismissal, ruled that plaintiff did not meet this burden.
[T]here is no testimony in this case from which a jury could reasonably infer that the Martinsville Inn * * * knew or should have known of Mr. Anslinger's condition. * * * [T]here is not sufficient evidence for a jury of reasonable men and women to reach the result of knowledge or should have known, the test established in the Soronen case. * * *
We agree with the trial judge's assessments of the proofs on this issue. Decedent was described as having had too much to drink, "tight," or "feeling his oats." However, there was no proof that his conduct was of a rowdy or boisterous nature while he was in the Inn, or that he acted in such a manner as to draw attention of the Inn's employees to anything unusual in his condition. There, of course, was no proof that any employee actually knew decedent was intoxicated. On the other hand, the Inn affirmatively asserted in its response to plaintiff's interrogatory that one of its employees stood at the door and observed all of the departing guests, none of whom exhibited any signs of intoxication. Significantly also, as Grier testified, Anslinger drove capably on the trip to the Red Bull  a journey of several miles over a dark and winding mountain road.
Accepting as true all evidence on plaintiff's behalf and giving it the benefit of all favorable inferences as we are required to do, there was, in our opinion, insufficient evidence to sustain a judgment in plaintiff's favor. The motion for involuntary dismissal was accordingly properly granted. R. 4:37-2; see Dolson v. Anastasia, 55 N.J. 2 (1969).
Plaintiff's argument as to the liability of the remaining corporate defendants is that corporate businesses should be held to the same standard as licensed tavern owners with respect to liability for damages caused by a customer to whom they served alcoholic beverages. On this theory they *534 argue that these defendants owed decedent a duty of reasonable care. The argument proceeds that the same reasons for imposing a special liability on liquor licensees applies to those who serve alcoholic beverages in the course of their business. The foundation underlying this theory is that both occupations are risk-creating and the cost of injury due to such risk can be widely spread through price mechanisms.
In the present case the meetings of the Raritan Traffic Club and the Caboose Club were only quasi-business in nature. Good fellowship appears to have been of importance, as well as the generation of future business. To hold business enterprises liable for the actions of drunken guests at their social affairs leads into extremely difficult questions of deciding what is business and what is social. Imposition of liability in such a situation would require not merely a considerable extension of the doctrine originated in Rappaport, but a departure from the theory which gave rise to the policy expressed therein. We are not persuaded that present social-economic conditions warrant this expanded concept of liability.
In any event, plaintiff would not be entitled to prevail under the circumstances revealed by the record in this case. It is clear that decedent's own conduct bars any recovery against these defendants. There can be no dispute that decedent's drunkenness led directly to his involvement in the fatal accident. Voluntary drunkenness ordinarily constitutes contributory negligence. We see no reason why that defense should not be applicable insofar as these defendants are concerned. See Bageard v. Consolidated Traction Co., 64 N.J.L. 316, 322 (E. & A. 1899); Tabor v. O'Grady, 59 N.J. Super. 330, 339 (App. Div. 1960). See Rappaport, supra, 31 N.J. 188 at 205.
The record reveals even less reason for holding McLean's employee, Grier, liable. There is no substance to plaintiff's arguments that his actions should render him responsible as a volunteer for decedent's safety. Specifically, plaintiff *535 seems to argue that Grier was negligent in permitting Anslinger to drive his automobile.
The duties of a volunteer are described, in pertinent part, in Restatement, Torts 2d, § 314A at 118 (1965):

* * * * * * * *
(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.
Under this standard defendant Frank Grier does not qualify as a volunteer. The requisite "custody" was never present. Custody implies some greater degree of control by the volunteer and reliance upon that control by the person in custody. For example, in the leading case on the duties of volunteers in this State, Barbarisi v. Caruso, 47 N.J. Super. 125 (App. Div. 1957), a grandmother was held negligent in looking after her seven-year-old grandchild. Other New Jersey cases relied upon by plaintiff have no bearing on the present situation. Even the case characterized by plaintiff as nearest to the one at hand, McDonough v. Buckeye S.S. Co., 103 F. Supp. 473 (N.D. Ohio 1951), aff'd 200 F.2d 558 (6 Cir.1952), showed a greater degree of control and reliance. There, a drunken sailor was being held by a security guard until a shipmate volunteered to escort him back. On the way the drunken sailor fell, the second sailor left, and the drunk rolled into the water and drowned.
Grier never assumed custody. We reject as unrealistic the suggestion that Grier should have physically overwhelmed the smaller decedent because by his expressions of concern he had assumed responsibility for the decedent's safety. Expressions of concern do not make a volunteer. Defendant McLean correctly points out the undesirability of such a rule. If concerned persons were to be held liable for the actions of the object of their concern, they might *536 well avoid even the mildest intervention. We do not believe it would serve the public interest thus to discourage members of the public from attempting to assist drunken drivers. In this case it appears that Grier did everything humanly possible to prevent decedent from operating his automobile.
Affirmed.