Leonard **TOSE,**
Counterclaimant/Plaintiff,

v.

**GREATE BAY HOTEL AND CASINO INC. t/a Sands Hotel, Casino & Country Club,** Respondent/Defendant.

Civ. A. No. 91–600 (JEI).

United States District Court,
D. New Jersey.

April 13, 1993.

A. Charles Peruto, Philadelphia, PA, Philip L. Blackman, Cherry Hill, NJ, for counterclaimant/plaintiff.

Frederick H. Kraus, Susan Shirk, Greate Bay Hotel and Casino, Inc., Atlantic City, NJ, for respondent/defendant.

## OPINION

IRENAS, District Judge:

On January 9, 1991, the Sands casino[1] sued Leonard H. Tose to recover alleged gambling debts. Mr. Tose filed a counterclaim seeking to recover gambling losses incurred at the Sands while he was alleged to be obviously and visibly intoxicated.[2]

Presently before the court in this tort action are questions presented by the parties regarding proper instructions for the jury. Specifically, defendants wish to have the jury instructed on the defense of comparative negligence against plaintiff, and on the issue of proximate cause. For the reasons stated below, the court will not charge the jury on either of these issues.

A jury trial on Tose's counterclaim was conducted from February 16, 1993 through March 5, 1993. Before the conclusion of the trial, defendant requested that the jury be charged on the issue of plaintiff's comparative negligence.[3] Defendant argued that plaintiff's becoming voluntarily intoxicated was contributory negligence, and that defendant's liability should thus be reduced to the extent that this negligence contributed to his losses. In addition, defendant requested that the jury receive a proximate cause charge, which would instruct that plaintiff could recover only for those losses which were causally related to the casino's permitting plaintiff to gamble while drunk.

### A. Comparative Negligence Instruction

The doctrine of comparative negligence is an affirmative defense that a defendant can assert to reduce liability. As codified by the New Jersey legislature, any damages attributable to a defendant's negligence "shall be diminished by the percentage sustained of negligence attributable to the person recovering," so long as the plaintiff's negligence was not greater than the defendant's. N.J.S.A. § 2A:15–5.1. Under New Jersey's previous doctrine of contributory negligence, any negligence by the plaintiff could bar all recovery. See Soronen v. Olde Milford Inn, Inc., 46 N.J. 582, 589, 218 A.2d 630 (1966); see also W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 65, at 461 (5th ed. 1984) [hereinafter "Prosser & Keeton"] (contributory negligence is complete bar to plaintiff's action for defendant's common-law negligence).

Both comparative and contributory negligence doctrines limit a plaintiff's recovery based on that plaintiff's negligent conduct.[4] A plaintiff is considered contributorily negligent where "[h]is actions are such as to constitute a failure to use such care for his safety as the ordinarily prudent man in similar circumstances would use." Hendrikson v. Koppers Co., Inc., 95 A.2d 710, 11 N.J. 600,

1. Plaintiff's full corporate designation is Greate Bay Hotel and Casino, Inc., t/a Sands Hotel, Casino & Country Club.

2. Because the trial at issue concerned only Tose's counterclaim, for purposes of convenience this opinion will refer to Mr. Tose as the plaintiff and to the Sands Casino as defendant.

3. The court issued an oral opinion on these issues on February 25, 1993. This opinion is intended to be consistent with the rulings rendered on February 25, but to the extent that there is any contradiction between the written and oral opinions this written opinion shall govern.

   The jury was charged in accordance with the court's oral opinion on March 3, 1993, and was instructed to make separate findings of liability for each of seven dates on which Tose allegedly gambled while visibly intoxicated and lost money. On March 5, 1993, the jury returned with a verdict of no cause of action for four of the days, and was unable to reach a unanimous verdict as to the remaining three dates. The court entered judgment in favor of Sands on the dates for which a verdict was returned, and granted Sands's motion for a mistrial as to the claims on the remaining dates. A second trial on those remaining three dates commenced on April 5, 1993.

4. For purposes of this opinion, that type of negligence by the plaintiff will be referred to as "contributory" negligence, even though the defense asserted is termed "comparative" negligence.

607 (1953); *see also* Prosser & Keeton § 65, at 453 ("Contributory negligence is conduct which involves an undue risk of harm to the actor himself."). One policy consideration underlying this doctrine is that "[o]ne's right to protection from the negligence of others carries with it the duty of reasonable care for one's own safety." *Milstrey v. City of Hackensack,* 79 A.2d 37, 6 N.J. 400, 414 (1951).

■ In the typical contributory negligence situation, the issue is whether the plaintiff was moving about in the world in a way that posed an unreasonable risk of physical injury to herself. *See, e.g., Milstrey,* 6 N.J. at 413–14 (plaintiff's duty to avoid impediments on sidewalk); *Hendrikson,* 11 N.J. at 608 (plaintiff's failure to observe and avoid open hole in a trench); *Keller v. Frank Kull, Inc.,* 165 N.J.Super. 258, 398 A.2d 106 (App.Div.1978) (plaintiff's opening lid of large dumpster which then fell on her); *Citro v. Stevens Institute of Technology,* 55 N.J.Super. 295, 150 A.2d 678 (App.Div.1959) (plaintiff's duty to avoid crack in sidewalk). The courts of New Jersey have undoubtedly imposed a duty on individuals not to place themselves in positions of unreasonable physical danger.

■ An individual who becomes voluntarily intoxicated increases the risk that she will move about carelessly and put herself in a dangerous position. Voluntary intoxication thus undermines the policy of individual responsibility on which contributory and comparative negligence defenses are based.

It follows that in New Jersey, individuals are generally not excused from acting negligently if their voluntary intoxication dulled their appreciation of a risk. Rather, an intoxicated person is held to the same standard of care as a sober person. *See Tabor v. O'Grady,* 59 N.J.Super. 330, 339, 157 A.2d 701, 706 (App.Div.1960); *see also Allen v. Rutgers, State Univ. of New Jersey,* 216 N.J.Super. 189, 195, 523 A.2d 262, 265 (App. Div.1987), *certif. denied,* 107 N.J. 653, 527 A.2d 472 (1987); *Anslinger v. Martinsville*

*Inn, Inc.,* 121 N.J.Super. 525, 534, 298 A.2d 84, 88 (App.Div.1972), *certif. denied,* 62 N.J. 334, 301 A.2d 449 (1973). As recently reiterated by the New Jersey Supreme Court, the state's "statutory and case law reflect the compelling public policy that those who voluntarily become intoxicated must be held responsible for the consequences of their behavior." *Lee v. Kiku Restaurant,* 127 N.J. 170, 182, 603 A.2d 503 (1992).

■ In the specific context of dram-shop liability,[5] other policy considerations have influenced the use of the contributory negligence defense. In *Soronen,* 46 N.J. at 587, the New Jersey Supreme Court held that a defendant tavern in a dram-shop action could not assert the patron's voluntary intoxication as a form of contributory negligence. *Id.* 46 N.J. at 592. The court reasoned that because it was New Jersey's policy to hold liquor licensees accountable for serving visibly intoxicated patrons, "[t]he accountability may not be diluted by the fault of the patron for that would tend to nullify the very aid being afforded." *Id.* It was significant that at the time *Soronen* was decided, a defense of contributory negligence would completely bar a plaintiff's claim. *See Lee,* 127 N.J. at 176.

New Jersey's adoption of comparative negligence principles altered the *Soronen* analysis, because a comparative negligence defense would not act as a total bar to plaintiff's recovery. Upon reexamination of this issue one year ago, the New Jersey Supreme Court found that "continued application of our holding in *Soronen,* adopted at a time when contributory negligence operated as a complete bar to a plaintiff's recovery, is no longer appropriate." *Lee,* 127 N.J. at 183.

The *Lee* court went on to hold that "in dram shop litigation a jury should apportion fault between the patron and the tavern based on the extent to which each party's negligence contributed to the plaintiff's injuries." Using the drunk driving case as an

---

**5.** In a dram-shop action, "a tavern keeper who serves alcoholic beverages when he knows or should know that the patron is intoxicated, may properly be found to have created an unreasonable risk of harm and thus to have engaged in negligent conduct.... [a]nd ... the tavern keep-er, as tortfeasor, may be held answerable for the injuries which result in the ordinary course of events from his negligent conduct...." *Soronen v. Olde Milford Inn, Inc.,* 46 N.J. 582, 587, 218 A.2d 630 (1966), *citing Rappaport v. Nichols,* 31 N.J. 188, 156 A.2d 1 (1959).

example, the court stated that a server may assert a comparative negligence defense against an intoxicated passenger who accepted a ride from an intoxicated driver "to the extent that the passenger's drinking to the point of intoxication contributed to his inability to appreciate the risk of his behavior." *Id.* at 187. The server may also assert this defense against an intoxicated driver "to the extent that the driver's act of drinking to the point of intoxication contributed to his inability to drive carefully." [6] *Id.*

Contributory negligence in a dram-shop action, therefore, is now not much different from contributory negligence in other contexts. Individuals have always had a duty not to put themselves at risk of physical injury by becoming voluntarily intoxicated, whether the risk be through driving or through engaging in other activities. What has made dram-shop cases unusual is that there the defendant has a corresponding duty not to contribute to the individual's intoxication after a certain point. It was

because of this additional duty on the part of the defendant, and not because of any lessening of the patron's duty, that New Jersey did not always permit the patron's voluntary intoxication to be considered contributory negligence.

Plaintiff's claim is based on the decision in *GNOC v. Aboud,* 715 F.Supp. 644 (D.N.J. 1989), where Judge Mitchell H. Cohen predicted that the New Jersey courts would hold that "a casino has a duty to refrain from knowingly permitting an invitee to gamble where that patron is obviously and visibly intoxicated and/or under the influence of a narcotic substance." *Id.* at 655.[7] Although there was no New Jersey state court authority imposing such potential liability on the casinos, Judge Cohen analogized the claim to a dram-shop action and found that imposition of this liability furthers New Jersey's public policy of "protect[ing] ... gambling patrons from the deleterious effects of alcohol imbibement." *Id.* 715 F.Supp. at 654.[8]

**6.** The court indicated that a plaintiff's drinking may only be considered contributory negligence up to the point at which the plaintiff becomes visibly and obviously intoxicated. *See Lee,* 127 N.J. at 184. After that point, it becomes the duty of the server to ensure that plaintiff does not consume any more alcohol. When discussing plaintiff's contributory negligence in the instant case, the court will thus be referring only to plaintiff's acts of drinking up to the point where he became visibly intoxicated.

**7.** The court is hearing this case pursuant to its diversity jurisdiction, 28 U.S.C. § 1332, and therefore the court must apply the law of the State of New Jersey. *Cf. Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

A federal court's application of New Jersey law to the issues of this case is a perilous affair, as New Jersey has not yet addressed them. It is possible that a federal court may incorrectly predict New Jersey law, thus disadvantaging the litigants. A federal court's deciding unsettled questions of state law also deprives the state of its ability to do so, contrary to our nation's principles of federalism. *See generally* Dolores K. Sloviter, *A Federal Judge Views Diversity Jurisdiction Through the Lens of Federalism,* 78 Va. L.Rev. 1671 (1992).

Yet as the Third Circuit aptly stated, "Although some have characterized this assignment as speculative or crystal-ball gazing, nonetheless it is a task which we may not decline." *McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657, 661 (3d Cir.1980), *cert. denied,* 449 U.S. 976, 101

S.Ct. 387, 66 L.Ed.2d 237 (1980); *see also Meredith v. Winter Haven,* 320 U.S. 228, 234, 64 S.Ct. 7, 10–11, 88 L.Ed. 9 (1943) ("difficulties of ascertaining what the state courts may hereafter determine the state law to be" not sufficient ground for declining jurisdiction).

**8.** The court acknowledges that *Aboud* is the law of this case, *see* Order Denying Motion for Reargument, The Hon. Joseph H. Rodriguez (D.N.J. May 11, 1992) (declining to reconsider *Aboud* ), and that pursuant to the law of the case doctrine the issue will not be relitigated. *See Hayman Cash Register Co. v. Sarokin,* 669 F.2d 162, 165 (3d Cir.1982). Nevertheless, taking its cue from Judge A. Leon Higginbotham, this court respectfully wishes to note a few of its reservations regarding *Aboud. Cf. Keenan v. City of Philadelphia,* 983 F.2d 459 (3d Cir.1992) (Higginbotham, J., writing for the court, and dissenting in part from the opinion).

To the extent that the *Aboud* cause of action is viewed as implied by the regulation limiting service of alcohol to inebriated patrons, or by any other statute or regulation governing casino operations, it runs afoul of the general notion that private causes of action are not ordinarily implied from regulatory enactments absent some indication of legislative intent. *See Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975), and *Middlesex Cty. Sewerage Auth. v. National Sea Clammers Assoc.,* 453 U.S. 1, 13, 101 S.Ct. 2615, 2622–23, 69 L.Ed.2d 435 (1981), cited in *Miller v. Zoby,* 250 N.J.Super. 568, 577, 595 A.2d 1104, 1108–09 (App.Div.

In *Lee*, the court stated that once a person is visibly intoxicated he is presumed to have lost the capacity to evaluate the risk of driving while intoxicated, or the risk of being a

1991). The New Jersey Appellate Division has already ruled that even a direct casino violation of the Casino Control Act does not create a private right of action *See Miller*, 250 N.J.Super. at 578–80, 595 A.2d at 1109–10. The case for an implied cause of action is even weaker where, as here, there is no direct regulation barring the conduct which is alleged to create liability—permitting an inebriated patron to gamble.

Nor can we consider the absence of such a regulation to be an oversight. The Casino Control Act contains many provisions designed to protect patrons. For example, the Act regulates casinos' serving alcohol to patrons, N.J.S.A. § 5:12–103, extending credit to patrons, N.J.S.A. § 5:12–101, and advertising to potential patrons, N.J.S.A. § 5:12–70(*o*). The Act also prohibits gambling by underage persons, N.J.S.A. § 5:12–119, and grants the Casino Control Commission considerable authority to regulate who shall or shall not be permitted to gamble. N.J.S.A. § 5:12–69(a) empowers the Commission to adopt regulations "necessary or desirable for the public interest in carrying out the provisions of [the act]," and N.J.S.A. § 5:12–71(a)(3) specifically authorizes the Commission to define categories of persons to be excluded from casinos "whose presence ... would ... be inimical to the interest of the State of New Jersey or of licensed gaming therein."

Considering the breadth of areas covered by statute and regulation, it would seem that if it were indeed the public policy of New Jersey to impose liability on casinos for allowing intoxicated patrons to gamble, that policy would have been enacted. The State has regulated the minutiae of gaming rules and alcohol service and expressly permitted the serving of free drinks to patrons at the gambling tables. Surely it could not have been unaware that the cognitive functioning of many gamblers would be impaired by drinking or of the consequences of permitting persons so impaired to gamble.

If one argues that *Aboud* is justified as a predictable extension of traditional common law principles, we are faced with the simple fact that casino gambling, which only became legal in 1977, is an activity where the respective rights and obligations of persons engaged in this activity have been articulated and developed by statutes and regulations, not by the common law. In contrast, dram-shop liability, as first articulated in *Rappaport*, 31 N.J. at 188, springs from two areas traditionally left to the common law, personal injuries and automobile driving. As noted in the body of this opinion, *infra* at 18–21, on close examination the superficial analogy between the dram-shop case and an *Aboud* case breaks down in numerous particulars.

It may be that the best argument to support an *Aboud* action is to completely discard the tort approach and to view the matter as one of contract between the casino and the gambler in which the placing and acceptance of a bet creates a contract in which both parties have aleatory obligations. We can then look at plaintiff's claim in terms of traditional contract doctrines such as capacity to enter a contract or a contracting party's obligation to deal in good faith with the other party. *See, e.g., Feighner v. Sauter*, 259 N.J.Super. 583, 590, 614 A.2d 1071, 1075 (App.Div.1992) (listing grounds for contract rescission, including intoxication); *Onderdonk v. The Presbyterian Homes of New Jersey*, 85 N.J. 171, 182, 425 A.2d 1057 (1981) (every contract has "implied covenant of good faith and fair dealing"). One Law Division case has held that traditional contract defenses were not erased by the Casino Control Act. *See Lomonaco v. Sands Hotel Casino*, 259 N.J.Super. 523, 614 A.2d 634 (Law Div.1992). However, because every aspect of the relationship between the gambler and the casino is minutely regulated by the state and there is little freedom of contract in the usual sense, there seems to be at least significant doubt that the New Jersey Supreme Court would recognize obligations not specifically called for by the statute or regulations.

It should also be noted that the creation of an *Aboud* cause of action raises collateral issues which are the proper function of the legislature and not the courts. *See Miller*, 250 N.J.Super. at 580, 595 A.2d 1104. A prime example is the applicable limitations period.

In this case Judge Rodriguez applied the New Jersey six-year statute rather than the two year limitation normally applied to personal injury actions. *See* Order of the Hon. Joseph H. Rodriguez, at 21 (D.N.J. Dec. 16, 1991) (applying six-year statute of limitations for tortious injury to property, N.J.S.A. § 2A:14–1); N.J.S.A. § 2A:14–2 (two-year statute of limitations for tortious injury to person). Thus, as in this case, a casino may not learn of a claim for six years. Surveillance tapes have long ago been erased and reused, and memories are dim.

Personal injury suits by their nature generally start an immediate investigatory process. Police reports, medical records, and insurance claims serve to document the events. Suffice it to say that the testimony at the first trial in this case vividly demonstrates the frailty of memory and the difficulty any casino has in defending this type of claim when it first learns of it six years after the fact.

Even if the legislature or Casino Control Commission wanted to create this cause of action, it would consider what the appropriate limitation period should be, whether there should be a still shorter period for filing a notice of claim with the casino, *compare* N.J.S.A. § 59:8–8 (must file claim under New Jersey Tort Claims Act within ninety days after cause of action accrues), and what kind of record retention policy should be imposed on a casino. Issues relating to the financial stability of casinos and possible amendments to the liquor regulations might also be considered in this context.

passenger with an intoxicated driver. 127 N.J. at 184, 187, 603 A.2d 503. The server is liable for continuing to serve a patron only after he has reached this incapacitated state. Likewise, *Aboud* imposes liability on casinos for failing to protect clearly intoxicated patrons who have lost the ability to "comprehend[ ] the consequences of continued, protracted gambling." 715 F.Supp. at 655.

However, while the actions of the casino defendants may be analogous to the actions of other dram-shop defendants, the significance of the plaintiffs' actions, particularly *before* becoming visibly and obviously intoxicated, is quite different. In dram-shop cases, New Jersey has held that an individual plaintiff has a duty not to increase her risk of physical injury, either by becoming voluntarily intoxicated, being unduly careless, or otherwise.

■ The crucial question in the instant case is whether the State of New Jersey imposes on a gambling casino patron a duty to protect herself from the financial injury which might occur if she gambles while her mental facilities are impaired by alcohol. Certainly the public policy of this state imposes such a duty on a negligent driver or foolhardy pedestrian through the doctrine of comparative negligence. Does the *Aboud* analogy to dram-shop liability dictate the same result for a gambler who carelessly becomes intoxicated?

Gambling, like other human activities, can create a risk of harm to one who engages in it. However, the state has a long history of seeking to protect the gambler from her own weakness or foolishness—prior to 1976 by a broad-based ban on gambling activity and thereafter by comprehensive regulation of casino activities.

New Jersey's restrictions on gambling date back to at least 1844, when the State adopted a constitution that made lotteries unlawful. N.J. Const. art. IV, § 7, par. 2 (1844), *reprinted in* N.J.Stat.Ann. (West 1971). That section of the constitution was amended in 1897 and again in 1939 to encompass additional forms of gambling, including "roulette ... game[s] of chance of any form ... pool-selling, book-making, or gambling of any kind...." *Id.; see also State v. Rucker,*

46 N.J.Super. 162, 168, 134 A.2d 409, 412 (App.Div.1957) (discussing New Jersey's constitutional prohibitions on gambling), *certif. denied,* 25 N.J. 102, 135 A.2d 59 (1957).

In its Constitution of 1947, New Jersey again incorporated a general prohibition on "gambling of any kind," N.J. Const. art. IV, § 7, ¶ 2. Gambling may only be authorized if it is of a type permitted in the constitution, or if it is submitted to and authorized by a majority of the people voting at a general election. *Id.* The current statutes of New Jersey also provide that "[a]ll wagers, bets or stakes made to depend upon ... any gaming by lot or chance ... shall be unlawful." N.J.S.A. § 2A:40–1.

Courts have viewed the temptation to gamble as extremely powerful. In *Lucky Calendar Co., Inc. v. Cohen,* 19 N.J. 399, 117 A.2d 487 (1955), the New Jersey Supreme Court referred to "the lure of the chance for 'easy money,'" which "has not changed in the [past] century." *Id.* 19 N.J. at 410. The court also quoted other judicial opinions describing lotteries specifically as "prey[ing] upon the hard earnings of the poor," "plunder[ing] the ignorant and simple," and "arous[ing] the desire to gain something for nothing." *Id.* 19 N.J. at 410, 413 (citations omitted).

New Jersey's restrictions on gambling are thus intended to protect both the individual gambler, and society, from the harms of gambling. *See Lucky Calendar,* 19 N.J. at 410–11 (restrictions prevent "catering to the weakness of *those whom the statute seeks to protect,* primarily for the benefit of society in general" (emphasis added)). New Jersey's policy of protecting those who fall prey to gambling is also evident from N.J.S.A. § 2A:40–5, which provides that a person who loses money or property in an unlawful gambling operation may sue to recover the value of what was lost. *See also* N.J.S.A. § 2C:37–2(c) (providing defense to criminal prosecution for gambling if person was only a "player," i.e. bettor); *but cf. Rucker,* 46 N.J.Super. at 171, 134 A.2d at 413–14 (although *in many instances New Jersey legislature has chosen not to punish bettors, some statutes can be construed to encompass player as violator*).

In 1976 the citizens of New Jersey voted to create an exception to the general ban on casino gambling. At that time a majority of voters approved an amendment to the state constitution that made lawful the establishment of gambling houses or casinos within Atlantic City. *See* N.J. Const. art. IV, § 7, ¶ 2(D); *see also Knight v. City of Margate,* 86 N.J. 374, 380, 431 A.2d 833 (1981) (discussing the constitutional amendment). In response to this constitutional amendment, the legislature passed the Casino Control Act in 1977. *See* N.J.S.A. 5:12–1 to 5:12–190.

As described by New Jersey's Supreme Court, the Casino Control Act's "statutory and administrative controls over casino operations ... are extraordinary pervasive and intensive.... Over 11 statutory articles and almost 200 separate provisions cover virtually every facet of casino gambling and its potential impact upon the public. The regulatory scheme is both comprehensive and minutely elaborate." *Knight,* 86 N.J. at 381. The Legislature recognized that the public had authorized this exception to the general policy against gambling in order to promote the economic welfare of Atlantic City, "and therefore determined casino gambling to be a revocable, highly regulated and conditioned privilege." *Id.*

Given this historical background, it cannot be said that New Jersey has generally placed upon potential gamblers the burden of protecting themselves from gambling losses. Whether through outright prohibitions or minute regulation, New Jersey has throughout its history exercised a high degree of control over gambling by regulating gambling operators, and not by penalizing bettors.

Furthermore, it would make no sense for New Jersey to authorize casino gambling while at the same time imposing a "duty" on a gambler to protect himself from loss. It is clear that gamblers are at a high risk of losing money in a casino—otherwise, the casino could not stay in business. Rules governing the play of casino gambling games are fixed by the Casino Control Commission, and these rules determine the odds which a gambler has of winning, odds which always favor the casino. *Cf., e.g.,* N.J.Admin.Code tit. 19, § 19:47–1.4 (1993) (payout odds for craps); § 19:47–2.7 (payout odds for blackjack); § 19:47–3.3 (payout odds for baccarat-punto banco). Only by choosing not to gamble at all can an individual insure freedom from gambling losses.

Yet even if a sober gambler has no duty to protect herself from loss, does it necessarily follow that one has no duty to avoid increasing the risk of greater losses by becoming intoxicated? Although a gambler can't change the advantage the house has in every game, an individual can minimize the amount of her loss by betting in a manner which gives her the best odds of winning,[9] by placing smaller or fewer bets and, maybe most importantly, by leaving the gaming tables before the losses grow to unacceptable levels. Since drinking will often impair cognitive functioning, an individual who drinks while gambling may be unable to take those actions which are necessary to minimize loss. *Cf. Aboud,* 715 F.Supp. at 655 (noting the risk of "continued, protracted gambling").

The New Jersey legislature has not clearly indicated an intention to impose on a gambler the duty to avoid becoming intoxicated while gambling. Specifically, the legislature has explicitly permitted casinos to serve alcoholic beverages at gaming tables upon request of the patron, *see* N.J.S.A. 5:12–103(g)(1), and these beverages may be served without cost to a patron and her guests, *see* N.J.S.A. § 5:12–102(m)(1). Although there is a regulation which forbids a casino to serve alcohol to a visibly and obviously intoxicated patron,[10] there is no regulation which either

---

**9.** A gambler can significantly improve her odds of winning certain games, depending upon the rules that are used. For example, "card counters" in blackjack "keep track of the playing cards as they are dealt and adjust their betting patterns when the odds are in their favor.... [which] allegedly ensures a profitable encounter with the casino." *Uston v. Resorts Int'l Hotel, Inc.,* 89 N.J. 163, 166, 445 A.2d 370 (1982); *see also Bartolo v. Boardwalk Regency Hotel Casino, Inc.,* 185 N.J.Super. 534, 538, 449 A.2d 1339, 1341–42 (Law.Div.1982) (discussing card counting).

**10.** The regulation in effect during the time of Tose's alleged losses was N.J.A.C. § 19:50–1.6(a), *reprinted in* 15 N.J.Reg. 541 (1983). The current version of this regulation, N.J.A.C. § 19:50–2.1, simply refers to the analogous prohibition in the alcoholic beverage control regulations, N.J.A.C. § 13:2–23.1(b).

forbids the casino or the patron from gambling while in this condition. Nor does there appear to be any legislative or regulatory recognition of the self-evident proposition that many people's mental abilities and judgment will be impaired by alcohol consumption *before* they become visibly and obviously intoxicated.

A gambler, particularly a high roller like the plaintiff [11] is under constant surveillance by a dealer, a floor person, a pit boss, hidden overhead cameras, and sometimes even by officials of the New Jersey Casino Control Commission. Since the regulation that prohibits serving a visibly intoxicated patron is based on the premise that casino employees can determine when a patron is visibly and obviously intoxicated, since it is a simple matter for the casino to prevent a patron from gambling while in this condition, and considering the extraordinary degree of regulation and control that the State exercises over casinos, the absence of a regulation barring gambling by a drunk patron cannot be considered an oversight or mistake. At the very least the State condones casino patrons drinking while they place bets, and the policy of providing free drinks on request could arguably be said to actively encourage this conduct.

*Aboud* was decided at the summary judgment stage and did not specifically consider the issues of comparative negligence [12] and proximate cause which are the subjects of this opinion. Because that court relied on the theory of dram-shop liability in predicting that New Jersey would recognize the theory of liability espoused in this case, it is tempting merely to apply the analogy in all its particulars, including the applicability of comparative negligence as determined in *Lee v. Kiku.* However, a closer analysis suggests at least seven major differences between the two situations: [13]

(i) While there is clearly an overwhelming state policy against an intoxicated individual driving or engaging in any other activity which risks bodily injury or property damage, New Jersey at the very least condones drinking while gambling.

(ii) With dram-shop liability, and the related doctrine of social-host liability, the defendant's negligent act is serving alcohol. In this case, defendant's negligent "act" seems more like an omission—defendant has failed to prevent plaintiff from engaging in a risky activity, gambling while intoxicated. Framed this way, the issue becomes whether defendant has an affirmative duty to protect a drunken patron, beyond its duty not to continue serving alcohol to the person. *Cf.* Prosser & Keeton § 56 (discussing some exceptions to general common-law rule that person has no legal duty to aid another).

(iii) In the context of a dram-shop case the ability of a server of alcohol to anticipate or prevent harm is somewhat limited. A bartender will often not know whether a patron who leaves the bar is going to drive, and even if she does, she will have very little if any ability to prevent the driving or any subsequent calamity. A casino patron's gambling activity is always totally controlled by casino employees who are in a position to

---

**11.** The term "high roller" is used by the casinos to describe patrons who bet large sums. Plaintiff would often bet $10,000 on a single hand of blackjack and would sometimes play five or more hands at the same time. Casinos, for obvious reasons, find high rollers to be desirable customers and make special efforts to attract their patronage. The Casino Control Act permits casinos to offer free food, lodging, transportation and other inducements to potential customers. *See* N.J.S.A. § 5:12–29 (defining "junket" as providing complimentary transportation, food, lodging, and entertainment based on person's propensity to gamble); § 5:12–102 (regulating junkets).

**12.** The New Jersey Law Journal reported in its April 12, 1993 issue that at trial the *Aboud* court did permit the defense of comparative negligence and that the jury found the casino liable for only ten percent of Aboud's losses. 133 N.J.L.J. 1391 (1993).

**13.** "A foolish consistency is the hobgoblin of little minds, adored by little statesmen and philosophers and divines." Emerson, "Self–Reliance," *Essays: First Series* (1841). To paraphrase a reading from the traditional Passover haggadah,

(Why is this case different from all other cases?)

immediately stop the gambling of any patron they know to be drunk.[14]

(iv) In a typical dram-shop case the harm being redressed is physical injury or property damage, and there can be little doubt that New Jersey public policy actively discourages conduct which leads to this kind of harm. In an *Aboud*-type case the harm is loss at the gambling tables, something the state as a general matter anticipates and on which it has based a large and substantial industry. Nobody is encouraged in New Jersey to go out and cause a "reasonable" amount of property damage and personal injury. The same cannot be said about gambling losses.

(v) Although dram-shop liability attaches even where the only harm caused by an inebriate is to himself, there is a substantial risk that bodily injury or other harm will result to innocent third parties, and the respective legal obligations of the server of alcohol and the drinker must be considered in this light. For the most part a drunken gambler is a menace only to herself.

(vi) As noted at pages 12–14, *supra*, New Jersey's public policy over the years has been to protect gamblers from consequences of their own weakness and folly, either by banning gambling or by minutely regulating those who operate games of chance. Public policy towards those who create the risk of personal injury has been to make them legal-

ly responsible for their conduct, a liability generally developed by common law courts rather than by legislation.

(vii) When allocating the respective obligations of the patron and the server in a dram-shop case, we must consider that the profit to the seller of alcohol earned by serving a few drinks too many is relatively small. As the allegations in this case demonstrate, letting a visibly and obviously intoxicated high roller gamble for even a short period of time can yield enormous profits to a casino.

Assuming, as this opinion does, that New Jersey would recognize the *Aboud* cause of action, the court cannot find that New Jersey would apply comparative negligence to a person who drinks, gambles, and loses. The public policies of New Jersey condone, and in certain ways even encourage, drinking, gambling and losing in a licensed casino. Accordingly, the court will not instruct the jury on comparative negligence.[15]

## B. *Proximate Cause Instruction*

At trial, defendants also raised the issue of what, if any, instruction the jury would be given on proximate cause. Such a charge would instruct the jury to make a finding as to whether the casino's act of permitting plaintiff to gamble while visibly and obviously

---

**14.** This distinction was implicitly recognized in the common-law doctrine of "last clear chance" which provides that where a plaintiff has negligently placed himself in a position of peril, a defendant should still be liable if the defendant knew or should have discovered plaintiff's vulnerable condition, and the defendant failed to exercise due care in avoiding harm to the plaintiff. *See Latta v. Caulfield*, 158 N.J.Super. 151, 156, 385 A.2d 910, 912 (App.Div.1978), *quoting* Restatement, Torts 2d § 479, at 530, and § 480, at 535 (1965), *aff'd*, 79 N.J. 128, 398 A.2d 91 (1979); *see also* Prosser & Keeton § 66, at 463 ("[C]ourts have said that the later negligence of the defendant involves a higher degree of fault ... where the defendant has discovered the plaintiff's helpless situation...."). Although this doctrine was rejected by the state of New Jersey to the extent that it permitted a plaintiff to recover regardless of the plaintiff's contributory negligence, *see Pangborn v. Central Railroad Co. of N.J.*, 18 N.J. 84, 100–01, 112 A.2d 705 (1955), *citing Brennan v. Public Service R. Co.*, 106 N.J.L. 464, 466, 148 A. 775 (E & A 1930), its germ of truth is relevant to analyzing a casino's obli-

gation to an intoxicated patron in a case proceeding on the *Aboud* theory.

**15.** In a previous ruling from the bench this court held that New Jersey would not recognize a claim for punitive damages in an *Aboud* case. Government-sanctioned free alcohol at the gaming tables, coupled with the absence of a statute or regulation barring an inebriated patron from gambling, led the court to conclude that the casino's conduct could not be considered as rising to the willful, outrageous, egregious and aggravated level necessary to impose punitive damages. *See, e.g., Fischer v. Johns–Manville Corp.*, 103 N.J. 643, 657, 512 A.2d 466, 473 (1986); *Herman v. Sunshine Chemical*, 257 N.J.Super. 533, 539, 608 A.2d 978, 980–981 (App.Div.1992). If, as noted in footnotes nos. 8 and 17, the case can be viewed as one sounding in contract, the exemplary damage claim is further weakened as New Jersey law does not generally recognize a punitive damage claim in contract actions. *See, e.g., W.A. Wright, Inc. v. KDI Sylvan Pools, Inc.*, 746 F.2d 215, 217 (3d Cir.1984).

intoxicated was the proximate cause of plaintiff's financial losses.[16]

■ As described by the courts of New Jersey, a tortfeasor "is generally answerable for an injury that results from his wrongful act in the ordinary course of events.... [U]nless so highly extraordinary that they cannot be considered natural, consequences which follow in unbroken sequence from the original negligent act, without an intervening efficient cause, are natural and proximate...." *Lutz v. Westwood Transp. Co.*, 31 N.J.Super. 285, 289–90, 106 A.2d 329, 331 (App.Div.1954), *certif. denied*, 16 N.J. 205, 108 A.2d 120 (1954).

■ An initial consideration in the "proximate cause" determination is whether defendant's conduct was a "cause in fact" of plaintiffs' loss. *Kulas v. Public Service Elec. and Gas Co.*, 41 N.J. 311, 317, 196 A.2d 769 (1964). Plaintiff must show that the particular harmful event at issue would not have occurred but for the defendant's negligence. *Id.* As to the necessary degree of causation, "it is generally sufficient if [defendant's] negligent conduct was a substantial factor in bringing about the injuries." *Rappaport*, 31 N.J. at 203; *see also Ettin v. Ava Truck Leasing, Inc.*, 53 N.J. 463, 483, 251 A.2d 278 (1969); *Lutz*, 31 N.J.Super. at 289, 106 A.2d at 331.

■ New Jersey has also imposed a foreseeability requirement in cases where defendant's negligence caused economic damage to the plaintiff, but no physical or property damage. In *People Express Airlines, Inc. v. Consolidated Rail Corp.*, 100 N.J. 246, 495 A.2d 107 (1985), the court held that economic damages can be recovered from a negligent defendant "when they are reasonably to be anticipated in view of defendant's capacity to have foreseen that the particular plaintiff ... is demonstrably within the risk created by defendant's negligence." *Id.* 100 N.J. at 267.

In addition to these factual findings, the proximate cause determination is also informed by issues of public policy. As recognized by the New Jersey Supreme Court in *Rappaport*, "policy considerations and the balancing of the conflicting interests are the truly vital factors in the molding and application of the common law principles of negligence and proximate causation." 31 N.J. at 205. Put another way, proximate causation is "that combination of ' "logic, common sense, justice, policy and precedent" ' that fixes a point in a chain of events ... beyond which the law will bar recovery." *People Express Airlines*, 100 N.J. at 264 (citation omitted).

■ In the instant case, the court finds as a matter of law that, if proven, the defendant casino's negligent conduct was a cause-in-fact of plaintiff's injury. If defendant had not breached its duty—i.e., if plaintiff had been stopped from further gambling once intoxicated—plaintiff would not have incurred any gambling losses at all. As discussed above, the activity of gambling contemplates that the gambler will lose at least some of the time. By permitting someone to gamble, a casino almost invariably will thereby "cause" that person to lose money. It thus follows that defendant's conduct is also a "substantial factor" that caused plaintiff's injuries.

Furthermore, as a matter of policy the court finds that it is impossible to allocate how much of any losses incurred would be specifically attributable to defendant's actions. One cannot make any reasonable calculation of what losses a sober gambler would have incurred compared to a drunken gambler, and it would be senseless to instruct the jury to do so. Maybe the sober gambler would not in fact have gambled for as long a time; maybe she would have placed smaller bets; maybe she would have played the cards differently. There is simply no prototype "normal" or "reasonable" gambler, and the jury should not be permitted to speculate on what losses a sober gambler would have incurred. *Aboud* says a patron who is visibly and obviously intoxicated should not be permitted to gamble at all.

---

**16.** This element of plaintiff's cause of action was explicitly not decided by the court in *Aboud*. In that case, the court stated that it is "the exclusive province of a jury to determine whether or not the ... 'proximate cause' ... element[ ] of the negligence case presently before us ha[s] been satisfied." *Aboud*, 715 F.Supp. at 656.

Accordingly, the court holds that any and all losses incurred while the plaintiff was allowed to gamble while drunk will be considered proximately caused by defendant's negligence, as a matter of law. The jury will therefore not be instructed to make a specific finding concerning proximate cause.[17]

---

**17.** As noted in footnote 8, one can view an *Aboud* action as sounding in contract rather than tort. In this light, plaintiff's suit can be considered a rescission action to restore the parties to their respective positions before they began entering gambling contracts while the plaintiff was visibly and obviously intoxicated. This approach yields the same result as the court's holding, which has been analyzed in a tort context. We note, in passing, the comment of Justice Blackmun in *East River S.S. Corp. v. Transamerica Delaval,* 476 U.S. 858, 866, 106 S.Ct. 2295, 2299–3000, 90 L.Ed.2d 865 (1985): "It is clear, however, that if this development were allowed to progress too far, contract law would drown in a sea of tort."